1  J. Gary Gwilliam, Esq. (State Bar No. 33430)
2  Randall E. Strauss, Esq. (State Bar No. 168363)
   Robert J. Schwartz, Esq. (State Bar No. 254778)
3  Jayme L. Walker, Esq. (State Bar No. 273159)
   Angelina M. Austin, Esq. (State Bar No. 336250)
4  GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
   1999 Harrison Street, Suite 1600
5  Oakland, CA 94612-3528
   Telephone: (510) 832-5411
6  Facsimile: (510) 832-1918
7  Email: ggwilliam@giccb.com; rstrauss@giccb.com; rschwartz@giccb.com;
   jwalker@giccb.com; aaustin@giccb.com
8
9  Attorneys for Plaintiffs
   GEORGIA DEFILIPPO AND
10 CHRISTINA DEFILIPPO

11                    UNITED STATES DISTRICT COURT

12               EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13  GEORGIA DEFILIPPO AND CHRISTINA DEFILIPPO, | Case No. 1:18-CV-00496-TLN-BAM |
| 14 | |
| 15 | **THIRD AMENDED COMPLAINT FOR DAMAGES** |
| 16  Plaintiffs, | **1.** **Violation of Civil Rights/Unlawful Search and Seizure (42 U.S.C. § 1983)** |
| 17  vs. | **2.** **Violation of Civil Rights /Malicious Prosecution(42 U.S.C. § 1983)** |
| 18 | **3.** **Violation of Civil Rights /Fourteenth Amendment (42 U.S.C. § 1983)** |
| 19  COUNTY OF STANISLAUS, CITY OF MODESTO, BIRGIT FLADAGER, MARLISSA FERREIRA, DAVID HARRIS; KIRK BUNCH, STEVE JACOBSON, JON EVERS, CORY BROWN, and DOES 1-10, inclusive, | **4.** **Violation of Civil Rights/***Monell* **Liability, (42 U.S.C. § 1983)** |
| 20 | **5.** **Violation of California Civil Code § 52.1** |
| 21 | **6.** **False Imprisonment/False Arrest** |
| 22 | **7.** **Intentional Infliction of Emotional Distress** |
| 23 | |
| 24  Defendants. | **DEMAND FOR JURY TRIAL** |

## I.   <u>INTRODUCTION</u>

2    1.    In August 2015, Plaintiffs Georgia DeFilippo ("Georgia") and Christina

3   DeFilippo ("Christina") were falsely arrested and maliciously prosecuted for murder.  After

4   sitting as prisoners through an 18-month preliminary hearing, one of the longest in California

5   history, a judge ordered the DeFilippoes released, explaining that it was "not difficult," given

6   the clear lack of evidence against them.  It was obvious that their only crime was being the wife

7   and stepdaughter of Frank Carson ("Carson"), a prominent Stanislaus County criminal defense

8   attorney, who also stood wrongly accused of murder.

9    2.    The DeFilippoes' ordeal began in April 2012, when the Defendant law

10  enforcement officials for Stanislaus County – stung by the series of high-profile defeats by

11  Carson – falsely and maliciously concocted a fanciful tale, wherein Carson, and by extension

12  Plaintiffs, concerned about the theft of antiques from their property, resorted to murder for hire.

13  Entirely innocent of any wrongdoing, the DeFilippoes were swept up in the Defendants'

14  conspiracy to ruin the life and career of Carson.

15    3.    Korey Kauffman, a local petty thief and crystal meth addict was reported missing

16  in Turlock in March 2012.  Unfortunately, such an event is not unusual in the Central Valley

17  and is ordinarily not considered to be a high-profile matter.  However, in this case, local law

18  enforcement learned that Kauffman was last seen near a property owned by Frank Carson.  At

19  the first mention of his name, the case was no longer about a missing person—it was perceived

20  by Defendants as an opportunity to exact revenge on Mr. Carson.

21    4.    In their zeal to tie Carson, and by extension Plaintiffs, to the disappearance of

22  Korey Kauffman, Defendants assembled a large multi-jurisdictional investigation or "task

23  force" that would rival any criminal prosecution in California history.  Ostensibly to investigate

24  this missing person—but in reality to effectuate their vendetta against Frank Carson—the task

25  force included members of the Stanislaus County District Attorney's Office, the Stanislaus

26  County Sheriff's Department, the Modesto Police Department, the Turlock Police Department,

27  the Ceres Police Department, and the California Department of Corrections.

28  ///

5. Many members of the task force had previously expressed ill-will towards Carson, with whom they had repeatedly clashed throughout the years. Leaders of the task force included District Attorney Investigators Kirk Bunch, who had been accused of misconduct by Mr. Carson, and Steve Jacobson, whom Mr. Carson was suing at the time for allegedly assaulting him in a courthouse. Carson's lawsuit asserted that Jacobson had "a long history of animosity against (Carson) and has repeatedly been exposed as a liar by him in court." Despite knowing about these personal conflicts, District Attorney Birgit Fladager appointed these two individuals to lead her team on the task force.

6. Throughout the course of the Kauffman investigation, the Defendants attempted to paint the legal and constitutionally protected acts of Georgia and Christina DeFilippo as evidence of criminal culpability. Thus, Carson, Georgia, and Christina's efforts to secure their property, including through police assistance, were "evidence" of a murderous conspiracy, while exculpatory evidence was completely ignored or destroyed. Indeed, the sum total of the evidence used to bring charges against Georgia and Christina amounts to a few innocuous communications, which no reasonable police officer or investigator would find established probable cause that they were involved in the commission of any crimes.

7. Although the DeFilippoes were eventually released and cleared of any wrongdoing they are forever changed. These law-abiding citizens were targeted by Defendants law enforcement officers without a shred of probable cause. Their privacy was invaded with unlawful searches of their person, homes, cell phones, and social media accounts. Their relationships and reputations have been forever sullied by the false charges levied against them. What's worse, in 2018, Frank Carson – loving husband & step-father – died as a direct result of his false imprisonment. The Defendants used the awesome power of the state to end the DeFilippoes' lives as they knew it. Much to the Defendants chagrin, they survived to tell their tale.

## II.   JURISDICTION AND VENUE

8. Pursuant to 28 U.S.C. section 1331, the Court has original jurisdiction over this action because it arises, *inter alia*, under the Constitution and laws of the United States. The

1  court has supplemental jurisdiction over state law claims.

2      9.      The Court has personal jurisdiction over the defendants because, *inter alia*, they

3  transact business in and engaged in wrongdoing in the District.

4      10.     Pursuant to 28 U.S.C. section 1391(b)(1)-(2), venue is proper because the

5  defendants reside in this District and a substantial part of the events or omissions giving rise to

6  the action occurred in the District.

7      11.      There are several pending related cases: *Carson v. County of Stanislaus, et al.*,

8  Case No. 1:20-cv-00747-TLN-BAM, *Quintanar v. County of Stanislaus, et al.*, Case No. 1:18-

9  cv-01403-TLN-BAM, Case No. 1:18-cv-00496- TLN-BAM, *Athwal, et al. v. County of*

10 *Stanislaus et al.*, Case No. 1:15-cv-00311-TLN-BAM, and *Wells et al. v. County of Stanislaus,*

11 *et al.,* Case No. 1:20-cv-00770- TLN-BAM. All related cases have been consolidated for

12 discovery and case management in the Sacramento Division of the Eastern District.  All of the

13 facts at issue in the *Carson* case arise out of the same facts and circumstances alleged here.

14 **III.    CONDITIONS PRECEDENT**

15     12.     For the state law claims against public entities and employees, plaintiffs Georgia

16 DeFilippo and Christina DeFilippo (collectively, "Plaintiffs") timely filed government claims

17 against the COUNTY OF STANISLAUS and CITY OF MODESTO, and their respective

18 employees, on October 3, 2017.  Plaintiffs filed amended government claims with the

19 COUNTY OF STANISLAUS and CITY OF MODESTO on November 13, 2017.  The

20 COUNTY OF STANISLAUS and CITY OF MODESTO rejected the claims on November 11,

21 2017.

22 **IV.    PARTIES**

23     13.     Plaintiff **GEORGIA DEFILIPPO** was 64 years old when she was falsely and

24 maliciously arrested for murder with the special circumstance of lying in wait, conspiracy to

25 commit murder, and false imprisonment.  Georgia is, and was at all times herein mentioned, a

26 citizen of the United States and a resident of Stanislaus County.

27     14.     Plaintiff **CHRISTINA DEFILIPPO** was 36 years old when she was falsely and

28 maliciously arrested for murder with the special circumstance of lying in wait, conspiracy to

commit murder, and false imprisonment. Christina was only supposed to be arrested for obstruction of justice and as an accessory but was arrested on a charge of first-degree murder due to an intentional error in the arrest warrant. Christina is, and was at all times herein mentioned, a citizen of the United States. With the exception of August 2012 to June 2014, when she resided in New York for graduate school, Christina was a resident of Stanislaus County.

15.     Defendant **COUNTY OF STANISLAUS** ("Stanislaus County") is a county, incorporated, duly organized, and existing under the laws of the State of California. Stanislaus County operates under its authority the Stanislaus County District Attorney and Sheriff's Department. Stanislaus County is vicariously liable for defendants BIRGIT FLADAGER, DAVID HARRIS, MARLISSA FERREIRA, KIRK BUNCH, STEVE JACOBSON, and CORY BROWN's wrongful searches, arrest and detention of Plaintiffs, as well as violations of their constitutional rights under California Civil Code section 52.1.

16.     Based upon the principles set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Stanislaus County is liable for the deprivation of Plaintiffs' rights protected by the United States Constitution, as set forth herein. Stanislaus County bears responsibility because its policies, practices, and/or customs caused Plaintiffs' injuries. In particular, Stanislaus County and its officials, including BIRGIT FLADAGER, MARLISSA FERREIRA, DAVID HARRIS, KIRK BUNCH, STEVE JACOBSON, and CORY BROWN, maintained or permitted one or more of the following official policies, customs, or practices:

   a. Failure to provide adequate training and supervision of Stanislaus County District Attorney attorneys and investigators, and Sheriff's Department deputies with respect to the constitutional limits on search, seizure, arrest, and detention;

   b. Failure to adequately discipline or retrain employees involved in misconduct;

   c. Selection, retention, and assignation of employees with demonstrable propensities for violation of constitutional rights;

   d. Condonation and encouragement of employees in the belief that they can violate the rights of persons such as Plaintiffs with impunity, and that such misconduct

1      will not adversely affect their opportunities for promotion and other employment

2      benefits; and

3          e.  Ratification at the highest levels of authority of the specific unconstitutional acts

4              alleged herein.

5      17.    Defendant CITY OF MODESTO is a municipal entity with the capacity to sue

6  and be sued.  It is a Charter City under the laws of the State of California.  The city operates

7  under its authority the Modesto Police Department.  The CITY OF MODESTO is vicariously

8  liable for defendant JON EVERS' unconstitutional conduct, including but not limited to

9  involvement in the wrongful search, arrest and detention of Plaintiffs, as well as violations of

10  their constitutional rights under California Civil Code section 52.1.

11      18.    Defendants BIRGIT FLADAGER, DAVID HARRIS, MARLISSA FERREIRA,

12  KIRK BUNCH, and STEVE JACOBSON, are and were at all relevant times employed by the

13  County of Stanislaus District Attorney and committed the acts complained of herein while

14  acting within the course and scope of their official duties.  They are sued in both their individual

15  and official capacities.

16      19.    Defendant CORY BROWN is and was at all relevant times employed by the

17  County of Stanislaus Sheriff's Department and committed the acts complained of herein while

18  acting within the course and scope of his official duties.  He is sued in both his individual and

19  official capacities.

20      20.    Defendant JON EVERS is and was at all relevant times employed by the City of

21  Modesto Police Department and committed the acts complained of herein while acting within

22  the course and scope of his official duties.  He is sued in both his individual and official

23  capacities.

24      21.    Plaintiffs are informed and believe, and thereon allege that each defendant is, and

25  at all times mentioned herein was, the agent, employee, representative, successor, and/or

26  assignee of each other defendant.  Each defendant, in doing the acts or in omitting to act, as

27  alleged herein, was acting within the scope of his or her actual and apparent authority, or the

28  alleged acts and omissions of each defendant as agent were subsequently ratified and adopted

1   by each other defendant as principal.  Plaintiffs are informed and believe that each of the

2   individual defendants was in some way responsible for the constitutional violations and torts

3   herein alleged.

4          22.     Plaintiffs are ignorant of the true names and capacities of the defendants sued

5   herein as Does 1-10, inclusive, and therefore sue these defendants by such fictitious names and

6   capacities.  Plaintiffs are informed and believe, and on that basis allege, that each defendant

7   sued under such fictitious names is in some manner responsible for the occurrences herein

8   alleged, and that their injuries as herein alleged were proximately caused by the conduct of such

9   defendants.

10  **V.     FACTUAL SUMMARY**

11                              **SWEPT UP IN A CONSPIRACY**

12         23.     Frank Carson was a prominent criminal defense attorney who had actively

13  worked to expose corruption within the ranks of Stanislaus County law enforcement.  Carson

14  was an extremely successful attorney, especially in cross-examining dishonest police officers

15  and investigators and had several high-profile verdicts in his favor and against the Stanislaus

16  County DA's Office.  As a result of Carson's success and aggressive tactics, he was reviled by

17  many in law enforcement and in the Stanislaus County District Attorney's office.

18         24.     On August 14, 2015, Georgia, Christina and Carson were falsely arrested and

19  maliciously accused of being involved in an elaborate murder for hire scheme that resulted in

20  the murder of Korey Kauffman, a local thief and drug addict, who had allegedly been stealing

21  from Carson's property on the night he disappeared.  Not satisfied to simply try to take down

22  Frank Carson, law enforcement maliciously went after his family as well.  Plaintiffs Georgia

23  DeFilippo, Carson's wife, and Christina DeFilippo, Georgia's daughter and Carson's

24  stepdaughter, were arrested and prosecuted as well.  Defendants concocted a theory to go after

25  Carson, and by extension Plaintiffs, based on a murder for hire scheme in which brothers Baljit

26  and Daljit Athwal, owners of the Pop N Cork convenience store in Turlock, and their employee,

27  Robert Woody, were solicited by Carson to murder thieves on his property in exchange for his

28  representation of Woody in a minor criminal case.  The Athwals, Woody and three California

1  Highway Patrol Officers, Eduardo Quintanar, Scott McFarlane and Walter Wells, were also

2  arrested as being involved in the murder of Kauffman as part of this preposterous theory.

3       25.    Defendants' theory arose because Frank Carson and his wife, Georgia DeFilippo,

4  have a hobby of collecting and selling antiques. They owned two properties in Turlock,

5  California, where they stored many of their antiques. Christina DeFilippo was living in one of

6  the properties in Turlock where antiques were stored. In or about February 2011, Christina

7  noticed that a lock on an outdoor container had been broken and the door was open. Christina

8  notified her mother and stepfather of this. Shortly thereafter, Carson and Georgia saw their

9  belongings being sold by another antique dealer and learned they were being robbed. Upon

10 investigation of their property, they discovered a hole in the fence and a beaten path from the

11 open container to an adjacent home rented by Mike Cooley. Mike Cooley is a career criminal,

12 law enforcement informant and a drug dealer. The Carson family contacted law enforcement to

13 report the thefts and the obvious evidence of the Cooley family's involvement, but they were

14 told that nothing could be done unless Cooley was seen with their property.

15      26.    Thereafter, Georgia, Christina and Carson took steps to prevent additional thefts

16 of their property. They left lights on in the house and installed a motion detector with Christina

17 notifying Carson and Georgia if the motion detector was activated. Carson also repaired sheds

18 and locks to bolster security. Carson created a stolen book alert, to give to book dealers in the

19 area in the hopes that someone would call the Sheriff's Department and report if his stolen

20 books were presented for purchase. The stolen book alert contained a list of the people who

21 lived in the Cooley household, the books and other antiques that were stolen, a description of

22 the Cooley's vehicle, Carson's phone numbers, and the Sheriff's Department's phone number,

23 along with the report number.

24      27.    Contrary to lies told to the court and the public by Stanislaus County Deputy

25 District Attorney Defendant **MARLISSA FERREIRA**, Korey Kauffman was not included on

26 this list as a suspected thief. Indeed, there was never any evidence that Carson, Georgia, or

27 Christina even knew Mr. Kauffman. Rather, Korey Kauffman was an associate of the Cooley

28 family and made his living by stealing things and recycling them for money. He was a known

thief and drug addict and had many enemies, including drug dealers and gang members from whom he had stolen.

28.     Kauffman did not return home on March 29, 2012, and was reported missing by his family on April 2, 2012.  On April 4, 2012, Defendant **KIRK BUNCH** filed a report that he claimed was based on information from a Turlock Police Department officer with whom Defendant **BUNCH** had worked in the past.  The conversation purportedly concerned statements from an informant, Michael Cooley, who was the last person to see Kauffman alive.

29.     According to **BUNCH**, Cooley sought to implicate Carson, and by extension Plaintiffs, in Kauffman's disappearance and subsequent murder — a murder Cooley may have in fact committed.  Defendant **BUNCH** did not record the conversation he claimed to have with Cooley and destroyed any notes from the conversation.  Defendant **BUNCH** and others omitted from search and arrest warrant applications this information about lacking or destroying records of this early and important purported conversation.  **BUNCH** immediately reported Carson's connection to the Cooley property to Defendant **HARRIS**.  Suddenly, the DA's Office became very interested in this missing person case. It was not long before Georgia and Christina were swept up in the conspiracy to destroy Carson.

30.     Shortly after Kauffman was reported missing in April 2012, District Attorney Defendants **BIRGIT FLADAGER** and Chief Deputy District Attorney **DAVID HARRIS** convened a task force for the purpose of investigating the Kaufman disappearance, but specifically for investigating Frank Carson.  Plaintiffs became targets of the investigation for no other reason than their connection to Carson.  Defendants **BUNCH** and **JACOBSON**, investigators with the DA's Office, primarily led the investigation, but the DA's office used several other Stanislaus County law enforcement agencies and federal funds designated for fighting gang violence in order to frame Carson, and by extension Plaintiffs, for murder.  It is highly unusual for the District Attorney's office to lead an investigation into a missing person, yet at the mere mention of Carson's name the District Attorney's office, primarily led by Defendant **DAVID HARRIS** became the lead investigating agency on this case.

31.     Many members of the task force had previously expressed ill-will towards Frank

1  Carson, with whom they had repeatedly clashed throughout the years. Defendant **FLADAGER**

2  was motivated to wrongfully investigate and prosecute Carson, and by extension Plaintiffs,

3  because she had lost several major trials against him prior to becoming DA. When Defendant

4  **FLADAGER** ran for DA, Carson was one of the largest contributors to her opponent, and since

5  her election, he had worked to have her recalled. In 2013, Carson ran against her for DA.

6  Following this challenge to her election, **FLADAGER** became even more motivated to frame

7  Carson for murder.

8          32.     Defendant **KIRK BUNCH** was the lead investigator. Carson had previously

9  exposed **BUNCH**'s corruption and dishonesty when Bunch was involved as an investigator in

10  another case involving a political vendetta against the former mayor of Modesto, Carmen

11  Sabatino, who was charged with crimes by the DA's Office in the early 2000s. Carson

12  represented Sabatino and wrote declarations in state and federal court exposing Defendant

13  **BUNCH** for dishonesty and accusing him of intimidating witnesses in the case. Defendant

14  **BUNCH** had a long history of corruption and Defendants **FLADAGER**, **HARRIS** and

15  **FERREIRA** knew or should have known that he was unfit to be in law enforcement. There

16  was Brady material on **BUNCH** that a physician in a worker's comp case said that **BUNCH** had

17  "manipulated and deceived him" and he did not believe Bunch should work as an investigator.

18          33.     Defendant **STEVE JACOBSON** was also involved in the malicious

19  investigation. JACOBSON has a long history of animosity against Frank Carson and has

20  repeatedly been exposed as a liar by Carson in court. Carson placed in ad in a local newspaper

21  accusing JACOBSON of misconduct. Prior to Carson's arrest, Defendant **JACOBSON**

22  assaulted Carson at the courthouse and Carson sued him. The civil case was pending during the

23  investigation.

24          34.     Defendant **FLADAGER** supervised Defendants **DAVID HARRIS** and

25  Defendant **MARLISSA FERREIRA** as well as **BUNCH** and **JACOBSON**. From the

26  inception of the investigation in 2012, Defendant **HARRIS** also supervised Defendants

27  **BROWN**, **BUNCH**, **EVERS**, and **JACOBSON** on the Carson investigation. In or around

28  2015, when **HARRIS** was accused of jury tampering and contempt of court in a case he had

1    with Carson as defense counsel, Defendant **MARLISSA FERREIRA** took over as the

2    supervisor of the investigation and of the investigators working the case.

3                              **SCORES OF EXCULPATORY EVIDENCE IGNORED**

4            35.      In the course of investigating the case starting in April 2012, Defendants

5    **BUNCH**, **EVERS**, **BROWN** and other officers were informed by numerous parties that a

6    number of individuals had threatened or attempted to kill Korey Kauffman in the days before

7    his disappearance.  However, not one witness accused Plaintiffs Georgia and Christina

8    DeFilippo of involvement in any crime.  They were simply arrested to put pressure on Frank

9    Carson.  Defendant **BUNCH** and other officials disregarded these viable suspects and instead

10   proceeded to focus extensive resources on investigating, arresting, and prosecuting Frank

11   Carson, and by extension Plaintiffs, without probable cause.  Among the viable suspects that

12   investigators never seriously pursued were the following:

13           a.   Michael Cooley: Cooley was a felon and a known drug dealer with ties to white

14                supremacist gangs.  He was the last person to see Kauffman alive, had an argument

15                with Kauffman prior to Kauffman going missing, and had previously threatened

16                Kauffman.  ***He confessed to a witness that he killed Kauffman and said, "that's***

17                ***what he gets for messing with our money."***  Charlie Odell reported to Bunch that he

18                encountered Cooley after Cooley had disposed of Kauffman's body.  Odell

19                submitted to a computer voice stress analyzer that indicated he was being truthful.  It

20                was known at this time that Cooley was selling drugs out of his residence, in

21                particular crystal methamphetamine, and that Kauffman was a crystal

22                methamphetamine addict.  Cooley also buried Kauffman's bicycle in his backyard

23                after Kaufman disappeared.  A polygraph test showed Cooley was being "deceptive"

24                about his involvement in the Kauffman murder.  Yet, he was never seriously pursued

25                as a suspect because he had no connection to Carson.

26           b.   Rudy Gonzalez: It is undisputed that Gonzalez had a dispute with Kauffman over a

27                scrapping deal.  ***48 hours before Kauffman was reported missing***, Gonzalez

28                attempted to run Kauffman over with his car in front of witnesses and then

*threatened to cut Kauffman's throat "from ear to ear."* Gonzalez told investigators he was "probably home" the night Kauffman was last seen but investigators did not confirm this weak alibi and never seriously pursued this individual because he had no connection to Carson.

c. Jason Armstrong: Armstrong had known ties to the Hells Angels. He disliked Kauffman and called him a "fucking tweaker," "fucking dirtball," and "piece of shit." Armstrong said, "Nobody liked Korey [Kauffman]." Armstrong also believed that Kauffman stole tools from a friend's business on East Avenue in Turlock. Another individual was brutally beaten by Armstrong and his friends because they suspected he had assisted Kauffman with stealing the tools. Moreover, Armstrong had a home where he threw frequent parties a few miles away from where Kauffman disappeared in 2012 and admitted to frequenting the area where Kauffman's body was found. **Game cameras placed David McMillan and Armstrong at the location where Kauffman's body was discovered** before information about the location was released to the public. Even though Armstrong told an investigator, "Didn't Korey Kauffman get shot" before that information had been released to the public, he was not seriously pursued as a suspect because he had no connection to Carson.

d. David McMillan: Game cameras placed McMillan and Armstrong at the location where Kauffman's body was discovered before information about the location was released to the public. McMillan said he did not know Kauffman but the results of his polygraph examination did not confirm he was being truthful. After the polygraph examination, McMillan was identified as possible witness or person of interest in an investigative report dated September 11, 2015. Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

e. Bobby Tickner: Tickner is an associate of Armstrong and McMillian. Tickner had a large illegal marijuana farm in the Stanislaus Forest near the location where Kauffman's remains were discovered. He was rumored to have moved Kauffman's

body in his white pick-up truck. Tickner admitted to law enforcement that he visited the Stanislaus Forest around the time Kauffman disappeared. Although Tickner agreed to wear a wire to gather information on Cooley, Armstrong, and others, the Defendants did not follow-up and he was not seriously pursued as a suspect or informant because he had no connection to Carson.

f. Brandon Starr: Starr was a Northern Ryder gang member who was involved in "gang banging." Starr had a dispute with Kauffman over a stolen Indian antique motorcycle. A witness claimed that Starr killed Kauffman because Kauffman stole Starr's Indian antique motorcycle. Starr said what happened to Kauffman was "Ryder business." After Kauffman went missing, Starr fled to New Mexico. Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

g. Teofilo Ramos: Ramos was a known violent Norteño gang member. He is also Rudy Gonzalez's, another viable suspect's son. Investigators learned that Ramos had a dispute with Kauffman at Al's Billiards before his disappearance and was looking for Kauffman. Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

h. Luis Garcia: Garcia was another known violent Norteño gang member. Garcia also had a dispute with Kauffman at Al's Billiards before his disappearance and was looking for Kauffman. Garcia was overheard saying "Korey was a pain in the ass to hide." Investigators knew about this but Garcia was not seriously pursued as a suspect because he had no connection to Carson.

i. Tina Carlos: An officer reported to investigators that Kaufman was stabbed while attempting to steal marijuana with friends. A witness heard that Kauffman was stabbed at Carlos' home while trying to steal marijuana and buried in Carlos' backyard. This witness submitted to a voice stress test analyzer that indicated the witness was being truthful. Four other witnesses reported a suspicious van with two passengers and a black bag containing a possible body inside the City of Ceres.

Carlos matched the physical description of one of the passengers. Yet, she was not seriously pursued as a suspect because she had no connection to Carson.

j. Tony Onate: Onate was an active Norteño gang member and Carlos' boyfriend. A witness told investigators that Onate buried Kauffman in Carlos' backyard. Four witnesses reported a suspicious van with two passengers and a black bag containing a body inside the City of Ceres. Onate matched the physical description of one of the passengers. Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

k. Michael Beede: Beede had a dispute with a Kauffman over drugs, money, or stolen scrap metal before Kaufman disappeared. Beede had a history of violence and had stabbed someone over a dispute involving marijuana a few weeks after investigators believed Kaufman was killed. There was evidence that Kauffman called Beede's girlfriend, Anna Yarborough, the night Kauffman went missing. Yarborough told **EVERS** that Beede had her cell phone that night. Yet, he was not seriously pursued as a suspect because he had no connection to Carson.

l. Victor Altamirano: According to Confidential Informant 14-1, Cooley witnessed the killing of Kauffman in his own backyard and showed Confidential Informant 14-1 the exact location in the backyard where Kauffman was killed. Cooley would not tell Confidential Informant 14-1 who killed Kauffman but told Confidential Information 14-1 to stay away from Starr and Altamirano. Yet, Altamirano was not seriously pursued as a suspect because he had no connection to Carson.

m. Eduardo Carbajal: Confidential Informant 14-2 told investigators that Carbajal knew who killed Kauffman, but it appears that investigators did not follow up because he had no connection to Carson.

n. Hector Lopez: Confidential Informant 14-2 told investigators that Lopez knew who killed Kauffman, but it appears that investigators did not follow up because he had no connection to Carson.

36. Despite the fact several people unrelated to Georgia, Christina or Carson had

made threats against Kauffman, the defendants ignored that evidence and conspired to frame Frank Carson and his family, Plaintiffs, for the murder. **None of this exculpatory evidence was disclosed to the judge in the arrest warrant for Plaintiffs Georgia and Christina DeFilippo**. Defendants obtained wiretaps for Plaintiffs, they surveilled them and obtained search warrants for their homes, vehicles, social media and cell phone records. Yet they did none of this for any of these more obvious suspects because they lacked a connection to Frank Carson. Simply, if there was no connection to Carson, Defendants were not interested.

37. Before the location where Kauffman's body was found was made public, Defendants **KIRK BUNCH** set up game cameras to watch the area. The cameras revealed that two marijuana growers and dealers, David McMillan and Jason Armstrong, were in the area where the body was found, before that information was made public. Michael Cooley had accused these same two dealers of murdering Kauffman for stealing marijuana from them and Defendants knew that McMillan and Armstong had made threats against Kauffman prior to his disappearance. Defendants **BUNCH** and **EVERS** interviewed McMillan on January 31, 2014 and Armstrong on December 29 and December 30, 2014. McMillan asked the Defendants why they were even investigating this case and said that Kauffman was a "piece of shit thief." Defendant **BUNCH** destroyed the evidence on the game cameras showing McMillan was in the area where the body was found. Defendants entirely ignored McMillan and Armstrong as suspects and continued to go after Carson and Plaintiffs. The incriminating video footage was deleted.

**PROCURING WOODY'S FALSE CONFESSION**

38. The largest piece of fabricated evidence in this matter was the false confession of Robert Woody. On February 18, 2014, Robert Woody, an employee of the Pop N Cork, a convenience store owned by the brothers Baljit Athwal and Daljit Athwal, was recorded on a wire bragging to a young woman that he alone had killed Korey Kauffman, cut him up and fed him to pigs. Woody and the young woman, Miranda Dykes, were smoking meth together when Woody in a delusional state made these crazy comments to try to impress Ms. Dykes. Defendants knew that what Woody was claiming did not match the physical evidence of the

crime.  Ms. Dykes cooperated with Defendants on a promise of getting her kids back from CPS, but she later adamantly told Defendants that she did not think Woody had anything to do with the murder.

39.     Woody was arrested March 1, 2014.  During the 7-hour interrogation with Defendants **BUNCH**, **JACOBSON**, and **JON EVERS** of the Modesto Police Department, through their questions, Defendants recited their theory implicating Carson and Plaintiffs in Kauffman's murder.  Despite enormous pressure put on Woody late into the evening and after midnight, Woody repeatedly denied any involvement in, or knowledge of, the Kauffman murder and could not identify Kauffman from a photograph.

40.     Ignoring his numerous emphatic denials, **BUNCH**, **EVERS**, and **JACOBSON** kept badgering Woody.  They threatened him with life imprisonment and the death penalty; they told him he might never see his family again and that his ailing mother would die before he was released from prison.  The following quoted words are actual statements made by the Defendant **BUNCH** during the lengthy interrogation of Woody on March 1, 2014.

    a) "They're all going to be pointing their fingers at you." (March 1, 2014, 27424.)

    b) "This is the golden opportunity" to implicate others.  (*Id.*, 27430.)

    c) Told Woody he is facing "life in prison."  (*Id.*, 27465.)

    d) Told Woody that the crime involved "lying in wait with special circumstances."
       (*Id.*, 27424.)

    e) "We can go for the death penalty."  (*Id.*, 27424.)

    f) Told Woody that people in Woody's situation "spend the rest of their life in
       prison."  (*Id.*, 27465.)

Upon information and belief, **EVERS** and **JACOBSON** were present when these statements were made **and knew that these statements were designed to fabricate evidence against Frank Carson, the Athwal brothers, and Plaintiffs** by association.  Defendant **EVERS** also commented that this was Woody's "golden opportunity" to implicate others in the Kauffman murder.  Any reasonable police investigator would know that such statements would be very

///

threatening to any rational person and could (and in this case, did) lead to false assertions by Woody in order to avoid harsh penalties, including the death penalty.

41. Defendants **JACOBSON**, **BUNCH**, and **EVERS** coerced Woody to fabricate evidence knowing full well it was false. The interrogation recording has a 20-minute-long gap in which Woody is said to be going to the bathroom. **<u>Defendants BUNCH and JACOBSON accompanied Woody and coerced him to falsely accuse his employers, the Athwals, and Frank Carson of being involved in the murder of Kauffman in exchange for leniency in any charges against him.</u>** ***<u>It was only after this unrecorded "bathroom break" that Woody began to repeat part of what he was told.</u>*** When Woody returned from the bathroom, he repeated to Defendants **BUNCH**, **JACOBSON**, and **EVERS** the theory that they laid out for him: that his employers, Baljit Athwal and Daljit Athwal had murdered Kauffman and that they did it because they were asked by Carson to watch over his property for thieves. **EVERS** was complicit in obtaining Woody's false confession because he was fully aware that Defendants **BUNCH** and **JACOBSON** had pressured Woody to repeat law enforcements false narrative during the "bathroom break."

42. Later, Woody also told Defendants that Kauffman's body was taken from Carson's property and buried at the Pop N Cork liquor store, a mere fourteen (14) inches underground, until it was dug up a month later and taken by Baljit Athwal to the mountains. The burial at the Pop N Cork allegedly occurred in a crowded neighborhood with no witnesses, and where numerous law enforcement frequented, yet no one so much as smelled a decomposing body that was a mere fourteen (14) inches underground right behind the backroom where law enforcement regularly gathered to drink after their shifts. No reasonable law enforcement officer would have believed that Woody's statement established probable cause to arrest Carson, or anyone else, especially when the physical evidence did not support it.

43. In addition to purposely intimidating Woody and leading him to believe that unless he "cooperated" he would face the death penalty, investigators scripted what they wanted him to say. Instead of allowing the alleged wrongdoer to tell them what happened, they fed him the information that they needed to go after Carson and his alleged enforcers, the Athwals, and

Plaintiffs, and then told him all he had to do was back up this concocted story and they would take care of him. The following quoted words are actual statements made to Woody during several interrogations over the course of almost two years:

**MARCH 1, 2014, INTERROGATION WITH DEFENDANTS BUNCH, JACOBSON, AND EVERS**

a) **Defendant Bunch**: "Prior to the murder . . . you guys were talking in front of him, okay, about Frank's property and how you were instructed to go find Korey Kauffman, okay, to make an example out of him." (March 1, 2014, 27418-27419.)

b) **Defendant Bunch**: "You're gonna be the one who's gonna be doing the right thing and who had probably the least involvement in saying that you were there, okay, and there were some hits that were thrown, not necessarily were gonna kill him but it just happened, okay." (*Id.*, 27423.)

c) **Defendant Bunch**: "I don't believe that you meant – that you knew he was gonna be murdered." (*Id.*, 27439.)

d) **Defendant Bunch**: "Everybody had their involvement. Everybody played a role, okay, and that's what needs to be told." (*Id.*, 27439.)

e) **Defendant Evers**: "You were involved or at least witnessed the murder." (*Id.*, 27458.)

f) **Defendant Jacobson**: "You perhaps witnessed this but that you didn't actually hurt this guy, you were actually like what your mom said, the guy who went to help Korey and you tried to pull this Bobby guy off." (*Id.*, 27476.)

g) **Defendant Bunch**: "I mean – I'm sorry – even if you did thumped on him doesn't mean you killed him." (*Id.*, 26223.)

h) **Defendant Bunch**: "Well me being a smart guy and operating off of common sense, okay, making reference to the murder that happened two months prior. Okay? 'Stay off the property. What happens to Frank, happens to me.' Those are the key points that were said afterwards, but we're interested in your confession, okay, about your involvement with the murder. Okay? That's what we're interested in. Okay . . . I'm trying to show you the light. This is your golden opportunity." (*Id.*, 27505.)

i) **Defendant Bunch**: "Baljit and Daljit were supposed to make an example for her, uh, Frank. Frank wanted – I mean pretty much was going on is they weren't gonna call law enforcement. Okay? They're – they were supposed to make an example. Because if they made an example of somebody the thefts would stop." (*Id.*, 27652).

j) **Defendant Evers**: "So you know as truth Baljit – Bobby – and Dee are responsible for the death of Korey Kauffman, right?" (*Id.*, 27656.)

**MARCH 3, 2014 INTERROGATION WITH DEFENDANTS BUNCH AND EVERS**

k) **Defendant Bunch**: "We'll make it better. Hey, all you're going to see is we're rolling the ball for you. . . . We need more stuff that can help us help you. All right?" (March 3, 2014, 27:3-4 and 27:25-26.)

l) **Defendant Bunch**: "Now I just want to tell you the DA is on board, okay, working with you. All right? Because there's other people involved in this whole thing. And so we're trying to get – all squeeze out all the information. Because if you squeeze out all information, this is going to be better for you. Okay? Because the DA wants to use you pretty much as like a kind of a witness . . . The DA is, I'm telling you, wants to work with you . . . And then what happens is the court – when the court comes up, the DA will talk to the court, your attorney, and work out a formal deal with you." (March, 3, 2014, 32551-552.)

**MARCH 14, 2014 INTERROGATION WITH DEFENDANT JACOBSON**

m) **Defendant Jacobson**: "And when you do tell the truth it can help you, and it can take you out of this situation that you're in and put you in a situation that is a lot more favorable for Robert Woody, and not go down for other people's misdeeds and not to be alone and be prosecutor by yourself at the table. Do you understand that?" (March 14, 2014, 30415-30416.)

n) **Defendant Jacobson**: "And so now these guys have basically done vigilante justice to kill somebody who stole from them and it would be like people at Walmart grabbing you mom and saying, 'you know what? You know deserve to die instead of your one year in the county jail for stealing video's now it's the death penalty.'" (*Id.*, 30423-30424.)

o) **Defendant Jacobson**: "The whole truth you're gonna go away for just (unintelligible) . . . You're never going to get to see your kids again except in visits when they come visit you in

prison . . . You'll – you'll never – you'll never see your or you'll never be able to spend time with your mom and your dad. With your mom's health conditions, you may not even – you may not even be able to be around her to comfort her when she needs you the most . . . And that's – and that's where we're coming from Robert." (*Id.*, 30406.)

p) **Defendant Jacobson**: "Because there's four people that are prime suspects in this case. You, Bobby, Dee, and Frank. . . . And you're the on – you're the only one that's in custody right now because of how the evidence is being played out . . . I guarantee that it took more than one person to do this. I guarantee that." (*Id.*, 30412.)

q) **Defendant Jacobson**: "They'll teach you a lesson and it's a lesson that they teach other people by how they treat you as well. They'll take you out. That's why you're where you're at." (*Id.*, 30425.)

r) **Defendant Jacobson**: "You're not the monster but you know who the monster is." (*Id.*, 30419.)

**AUGUST 14, 2015 INTERROGATION WITH DEFENDANT JACOBSON AND CALIFORNIA HIGHWAY PATROL SERGEANT KEVIN DOMBY**

s) **Defendant Jacobson**: After telling Woody that he has a chance to talk to the deputy District Attorney: "And I hope that you believe that you're in a position that you can help us as well as help yourself." (August 14, 2015, 28516.)

v) Sergeant Domby: "We're both here to help you." (*Id.*, 28604.)

w) Sergeant Domby: "You're the one that had the Chief Deputy DA – had Marlisa talking to you saying, 'I've been trying to help here with you being able to tell what happened.'" (*Id.*, 28698.)

x) **Defendant Jacobson**: "It was daylight, in the BMW, right in front of Korey's house. The neighbor was across the street and outside and heard this. Identified the black BMW. Identified you and identified an Indian male in the vehicle as well. And we all know it was Daljit's BMW." (*Id.*, 28561.)

y) **Defendant Jacobson**: "But the neighbor says she heard a male from the vehicle say, 'Your ass is grass,' and the vehicle drives away. And then the neighbor describes this black

BMW with an Indian male driver and a white guy.  And another person says, 'Yeah, that was Robert Woody.'  And the Indian male they're kind of unknown as to which one it was, whether it was Baljit or Daljit." (*Id.*, 28562.)

z) Sergeant Domby: "They looked at you as somebody they could use for whatever they needed to do, whether it was to drive by, um, Korey's house and yell out the window.  'Woody, will go.  Get in the car.  Let's go.  Let's go do this.'  Right?" (*Id.*, 28634.)

a) Sergeant Domby: "Those details are important because details let us know that you're telling the truth.  When they match up with the details we have, right?  That's what I told you about the cellphones. . . . There are some details that I'm absolutely right about.  That's why I shared with you the stuff about the CHP sergeants." (*Id.*, 28650-51.)

ab) Sergeant Domby: "We're talking about Bobby hitting Korey in the back of the head, in the ribs . . . . Okay, with his fists, right?  Not with another weapon." (*Id.*, 28657.)

ac) **Defendant Jacobson**: "Although there may be some doubt as to what you actually did at Frank's property, it seems pretty clear that the common denominator between everybody and even it coming out of your own mouth with Sunny is that you cleaned up.  You know you – you helped them in some manner or some shape – some form or – of another to – to help clean up this situation." (*Id.*, 28713).

ad) **Defendant Jacobson**: "I mean, this was – Baljit and Daljit were saying this was going to make uncle Frank proud and – and it was going to, you know, this was what they wanted to do for him?" (*Id.*, 28776.)

ae) Sergeant Domby: "It certainly you got a sense that they felt the beating that they were delivering to Korey was going to make Frank happy?" (*Id.*, 28777.)

af) Sergeant Domby and Investigator Jacobson suggest that Dee fired with a small caliber handgun, like a .22 (*Id.*, 28686-28687.)

ag) Robert Woody said that he didn't see any weapons, after which the following exchange occurs:

Sergeant Domby: "You didn't see a weapon but that doesn't mean there wasn't one.  Uh, and then as they walk away or as you walk away you hear the sound."

Woody: "Yes."

Sergeant Domby: "That could've been a gunshot." (*Id.*, 28691.)

**OCTOBER 6, 2015 INTERROGATION WITH DEFENDANT JACOBSON**

ah) **Defendant Jacobson**: "It just is not making sense. Bobby had already been on the property. Bobby had been in the backyard. Bobby had been through the pedestrian gate. He knew what the property looked like. Bobby had pulled guard duty on the property, obviously . . . catching Korey." (October 6, 2015, 27934.)

ai) **Defendant Jacobson**: "So, she said that she's walking down the road. And she sees you as a passenger in the car. She sees an Indian male driving. It's Dee's BMW. And she sees you guys driving by. And Korey – Korey walks up to her at – at that period of time right after this threat is made." (*Id.*, 27942.)

aj) **Defendant Jacobson**: "The car doesn't make an abrupt stop? It doesn't injure your neck? You're not rubbernecked. You're not like, 'What the hell is going on? Why did we just stop in the middle of the road?' Okay, it's almost like it's preplanned." (*Id.*, 27943.)

**FEBRUARY 9, 2016 INTERROGATION WITH DEFENDANTS BUNCH, JACOBSON, AND EVERS**

ak) **Defendant Bunch**: "You weren't there at all? Has someone gotten to you, Robert?...Meaning Baljit and Daljit or even Frank Carson or a representative of Frank Carson? Have they gotten to you?" (February 9, 2019, 25899.)

al) **Defendant Bunch:** "Prior to the murder – prior to the murder, okay? You guys were talking in front of him, okay, about Frank's property and how you were instructed to go find Korey Kauffman, okay, to make an example of out of him. That's what you – that's what your nephew said…" (*Id.*, 25903.)

Any reasonable police investigator would know that such leading and suggestive statements are contrary to reasonable police practices and would (and in this case, did) lead to false assertions by Woody in order to appease the investigators and avoid harsh penalties, including the death penalty.

44. On April 24, 2014, law enforcement gave Woody a polygraph test and he was

asked whether he had anything to do with murder. He said no, and he passed the test. However, Woody's false confession made him the state's only eye witness to the alleged murder and the central piece of evidence in Defendants' criminal case against Carson, Plaintiffs, the Athwals, and three CHP officers. So, the defendants ignored the results of Woody's polygraph and continued to pursue their outlandish conspiracy against Carson, and by extension Plaintiffs. Existence of Woody's polygraph was not disclosed to Plaintiffs until 10-months into their preliminary hearing.

**ARREST WARRANT LACKED PROBABLE CAUSE**

45.     There was never any evidence to connect either Georgia or Christina DeFilippo to the disappearance of Korey Kauffman. A search warrant executed July 15, 2013, and all subsequent investigatory efforts revealed no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found on Carson's property where Christina was living and the Defendants claimed the murder occurred.

46.     On August 13, 2015, with no more evidence against Plaintiffs than Robert Woody's testimony which was unreliable and completely unbelievable, had repeatedly changed over time, and even contradicted the physical evidence in the case, Defendant **CORY BROWN** submitted a Ramey Warrant for Plaintiffs arrest. The preparation of the arrest warrant affidavit was a joint effort that resulted in what **BROWN** described in his deposition as a "group consensus" between himself and Defendants **FLADAGER, FERREIRA, BUNCH, EVERS,** and **JACOBSON** on what charges to seek and what facts to include (and exclude) in the warrant. Plaintiffs are informed and believe and thereon allege that Defendants **FLADAGER, FERREIRA, HARRIS, EVERS** and **JACOBSON** reviewed the arrest warrant and knew it contained fabrications and omissions of exculpatory evidence and was inherently misleading, yet all of them were party to giving the facts in the warrant to Defendant **BROWN** as part of their joint conspiracy to frame Frank Carson and Plaintiffs for murder. Defendants **FLADAGER, FERRERIA, HARRIS** and **BUNCH** ordered Defendant **BROWN** to submit the 325-page warrant to a judge, knowing that no judge would have time to carefully review the unorganized, rambling document. No reasonable law enforcement officer would have believed

that the arrest warrant established probable cause for Plaintiffs' arrest.

47.     Indeed, the "evidence" in the August 13, 2015, arrest warrant against Plaintiffs was limited to the following:

a.   Christina was told to keep the lights on in her house to keep thieves away.

b.   Fourteen months before Mr. Kauffman went missing, Christina and Georgia exchanged text messages stating that Frank Carson was "freaking out" about thefts on their property and would have a gun when he came to the property that night.  The warrant leaves out the fact that Carson was coming to the property to fix a broken lock that had just been discovered and might encounter thieves or may fear for his safety while doing so.

c.   A text message that Carson was coming to the house with a motion detector.

d.   A text message that the maintenance person would be coming over to fix locks and that the alarm had not gone off when this happened.

e.   A text message exchange about an employee of Carson that had nothing to do with the investigation.

f.   When Christina found the broken lock in the yard, Georgia asked her to go out in the field and see if anyone had taken anything or if thieves were present.

g.   Months after the disappearance of Mr. Kauffman, Christina banged on a window in her house because the neighbors (not the Cooley family but other neighbors) were mowing their lawn early in the morning.  She broke the window and called her mother, upset about it.  Georgia tried to make light of the incident and said, "what do you want me to do, shoot them?"  Georgia told Christina not to worry and that the window could be fixed.  She said, "We will have to do something about them," referring to the installation of energy saving, noise blocking, double pane windows.

h.   A text message exchange between Christina and Georgia about a cat or racoon setting off the motion detector, wherein they joked about shooting the racoon but

not the cat.  The defendants maliciously omitted the "lol" (laugh out loud) contained in the exchange, attempting to make it appear sinister.

   i.  Christina was told by Kenneth Barringer, Stanislaus County Sheriff's Deputy, that her neighbors thought Mr. Kauffman was nailed into the wall of a shed on her family's property.  Christina told Georgia about this, who responded, "there are certainly no dead bodies over there."  Incredibly, the defendants claimed that Christina telling her mother she was contacted by law enforcement was "passing information."

   j.  Christina informed her mother that she stepped on a board with nails in it.  Preposterously, the defendants claim this was a booby trap known to Christina.

   k.  When Georgia learned that the family's property had been searched by law enforcement with cadaver dogs, she asked if they found any dead bodies, to which Carson responded, "Hell no, there aren't any."

   l.  Christina was told to have a lawyer before speaking with police, even though she fully cooperated without a lawyer present.

   m. Allegedly Christina had no cell phone activity with the implication that her cell phone was off on the night of Mr. Kauffman's disappearance.  However, the truth was that her cell was on and making data connections the entire evening.

Clearly, none of the above shows any evidence of a crime or even knowledge of a crime being committed.  As each Defendant either conducted interviews, participated in daily briefings, wrote or read reports of witness statements and conveyed the status of the investigation to their superiors, all Defendants knew there was not probable cause to arrest Georgia and Christina.

   48.   In addition to ignoring the obvious lack of evidence against Georgia DeFilippo and Christina DeFilippo, the defendants fabricated evidence and made material misrepresentations and pivotal omissions in the arrest warrant that violated their privacy, Fourth and Fourteenth Amendment rights.  These fabrications included but is not limited to, the fact that Korey Kauffman went missing on March 30, 2012, when in fact substantial evidence, including statements from Kauffman's family, show he went missing on March 29, 2012, and

that Plaintiffs' phones were registered to or used by Frank Carson, when in fact they were registered to Georgia DeFilippo. There is also evidence that at least one judge told the defendants that other warrants lacked probable cause. Georgia and Christina are informed and believe that the same warrant, despite the defendants' knowledge that it lacked probable cause, was used with another judge to execute a wiretap on their phones. The warrant that was rejected, is now mysteriously missing.

### FABRICATIONS, MATERIAL OMISSIONS AND MISLEADING STATEMENTS IN THE ARREST WARRANT

49. There were several fabrications, significant misstatements, material misrepresentations, lies, and blatant omissions of exculpatory information in the warrant to secure Plaintiffs' arrest:

    a. The arrest warrant indicates that Kaufman disappeared on March 30, 2012. This was not true, he disappeared on March 29, 2012. Kaufman's family put out fliers indicating that Kaufman disappeared March 29, 2012 and marked Kauffman's tombstone with March 29, 2012, as the date of death. Defendants knew this date was inaccurate but continued to use it as the date of disappearance because their junk cell phone expert, Jim Cook, gave opinions implicating Carson, CHP Officer Wells and the Athwals were in the vicinity of Carson's Turlock property on the night of March 30, 2012. This expert's testimony was later excluded from the criminal trial after he admitted under oath that the cell towers showed that the Athwals were never on the Carson property the night of March 30, 2012 and were at the Pop N Cork just as they always said they were.

    b. The warrant alleges that Kauffman was going over the fence to steal metal pipes, but law enforcement knew full well there were never any pipes on Carson's property because of witness interviews.

    c. Defendants made several false and misleading representations in the warrant to place Plaintiffs and Carson in a negative light, including omitting an "LOL" from a text message that clearly indicated Plaintiffs were joking, misrepresenting

Carson's interactions as an officer of the court, including saying that Carson lied in a 911 call he made when Defendants trespassed at his law office and would not leave.

d.  The warrant omitted the extreme coercion and improper tactics, such as contamination, employed to fabricate Robert Woody's statements as detailed above. Even though law enforcement fed Woody non-public facts of the murder, he never provided any on his own, they falsely claimed in the warrant that he knew non-public facts about the crime. No reasonable law enforcement officer would have believed that Woody's testimony established probable cause to arrest anyone, especially when it contradicted the physical evidence of the crime.

e.  The arrest warrant says Carson visited Ron Cooper in jail to solicit his "muscle" to help him with thefts on his property. It was easily verifiable that Carson had never visited Cooper in jail, yet Defendants omitted this fact from the arrest warrant.

f.  The warrant does not disclose what the affiant, Brown, has recently admitted in deposition—that the cell phone tower expert's opinions are (at least in significant part) based on "**inherently misleading**" theories.

g.  The warrant does not disclose another critical admission recently made by the affiant in deposition about Cook, the purported cell phone tower expert: "**My limited understanding of how Jim Cook conducts his business is not consistent with the training that I've received**." (Brown Deposition, June 24, 2021.)

h.  **BROWN** admitted in deposition that Cook was the only source for the critical – and false – assertion in **BROWN**'s arrest warrant affidavit that Baljit Athwal went to the "specific area" where the body was found. But even Cook doesn't go that far. Indeed, **BROWN** testified that he does not recall where the "specific area" language came from. In truth, there was never any evidence that Baljit Athwal was anywhere near the body and telling the Court that he was in the

"specific area" where the remains were found is, as **BROWN** now admits, inherently misleading.

i. The arrest warrant did not contain any information about the lack of credibility of the witnesses, including multiple contradictory statements by witnesses, especially Robert Woody's several different statements where he denied involvement altogether or said the Athwals hired a Mexican prison buddy to kill Kauffman (even though neither Athwal had ever been to prison). It further failed to inform the judge of grants of immunity or plea deals given to witnesses and the extreme coercion employed to fabricate witness statements.

j. The warrant falsely states that "Investigators have **followed up on every lead** that has been brought to the attention regarding Kauffman going missing and being murdered to the best of their ability." (Bold added.) In fact, unbeknownst to the judge who signed the arrest warrant, **there were many suspects who had threatened to kill or harm Kauffman who were not investigated and who were not mentioned in the arrest warrant**. One of those suspects had threatened to cut Kauffman's throat "from ear to ear," 48 hours before Kauffman disappeared, but Defendants omitted that key information from the arrest warrant affidavit.

k. The warrant failed to inform the judge that drug dealers, McMillan and Armstrong, were seen on game cameras near where the body was found prior to public disclosure.

l. The warrant fails to disclose that at least three key witnesses mentioned in the affidavit (Mike Cooley, Eula Keyes, and Keith Hobbs) — the last people who saw Kauffman alive — were each found to be "deceptive" about their knowledge of Kauffman's disappearance when voice stress analysis tests were administered

m. The fact that Cooley also accused other people of being involved in the murder of Kauffman including Tina Carlos, Victor Altamirano, and Brandon Starr was never disclosed in the arrest warrant.

n.  Defendants bias against Carson, including Carson's civil lawsuit against Jacobson for assault, a jury tampering hearing against Jacobson and Harris, and the accusations that Carson had made against Bunch were never disclosed in any arrest warrant.

o.  The warrant deliberately omitted any information about the physical evidence because Defendants knew that the physical evidence, including the fact that there was no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found on Plaintiffs' property where the Defendants claimed the murder occurred or at the Pop N Cork where Kauffman was allegedly buried, showed there was not probable cause to arrest Carson, or anyone else that was arrested, for murder.

50.  Following their false and unlawful arrest, the Defendants conducted a press conference where Georgia and Christina DeFilippo were defamed and accused of being parties to a murder.  Later, Plaintiffs discovered that for the first time in Stanislaus County history, the entire arrest warrant, including the personal identifying information and social security numbers of the accused, was posted online.

51.  GEORGIA DEFILIPPO spent 50 days in jail until she was released on October 4, 2015, because of egregious ethics violations by Defendant **MARLISSA FERREIRA** Stanislaus County Deputy District Attorney.  Georgia's bail was set at $10 million but ultimately reduced $4.5 million.  CHRISTINA DEFILIPPO was bailed out of jail the same day she was booked, but not before her entire life was ruined by the very public false and malicious acts of the defendants.

52.  A preliminary hearing began on October 13, 2015, and continued for 18 months, one of the longest in California history.  At first, GEORGIA and CHRISTINA DEFILIPPO were required to sit through every day of the hearing, although only the first day included any evidence against them. Finally in November 2016, Georgia and Christina were excused and only required to attend on certain days.

53.  During the preliminary hearing, Defendant **JACOBSON** procured further false testimony from Robert Woody because there was not enough evidence linking Frank Carson

and CHP Officer Walter Wells to the murder because Woody had repeatedly told investigators that Carson had never asked them to hurt anyone stealing from his property. Defendant **JACOBSON** had Robert Woody's mother, Beverly Woody, hold up a note to Robert Woody during a jail visit telling him they needed more implicating Carson and Wells. Following this, Woody changed his story for the umpteenth time and said Carson and Wells were on the property the night Kauffman was murdered. Woody recanted this statement several days later.

54.     On April 10, 2017, Judge Barbara Zuniga dismissed the charges against GEORGIA and CHRISTINA DEFILIPPO, finding there was insufficient evidence to support them. As to Georgia, the judge ruled, "I am going to find that there . . . is no sufficient cause to believe that she is guilty of murder and/or obstruction of justice, and I order that the Complaint be dismissed and she is discharged." Likewise, the judge ruled that there was also insufficient evidence to find that Georgia was guilty of accessory, a charge then planned by the prosecution. As to Christina, the judge ruled, "I am finding that there is no sufficient cause to believe that she is guilty of the alleged crime of accessory and obstruction of justice, and I order that the Complaint as to her be dismissed and that she is discharged." The judge described her rulings as to Georgia and Christina as "not difficult." Thus, after an 18-month preliminary hearing, the judge easily found that there was insufficient evidence to support the charges against Georgia and Christina.

### DEFENDANTS' WRONGFUL ACTS

55.     All of the defendants were involved in a conspiracy to violate Georgia and Christina DeFilippo's constitutional rights and the right to privacy, as well as a conspiracy to defame, falsely arrest, and maliciously prosecute them. Each of the defendants were involved in the malicious, retaliatory investigation and prosecution and/or in furthering the goals of the conspiracy, which was to destroy the life and career of Frank Carson and his family, the Plaintiffs.

56.     **Defendant BIRGIT FLADAGER:** Fladager ratified and condoned unconstitutional policies and decision-making in the District Attorney's office including the coercion of criminal defendants to give false statements against Carson, that were used to

implicate Plaintiffs, in exchange for their cases being dropped or significantly reduced. Almost every witness that in any way implicated Frank Carson was a career criminal whose own criminal charges were dropped or significantly reduced in exchange for testimony against Carson and Plaintiffs by extension. No witness implicated Georgia or Christina DeFilippo. During the investigation Fladager among other things, personally:

     a.   Participated in regular briefings on the investigation.

     b.   Retained junk cell phone expert Jim Cook to provide misleading evidence used to frame Carson and Plaintiffs for murder.

     c.   Was intimately involved in approving the fabricated and misleading arrest warrant to frame Plaintiffs and reviewed the final draft prior to submitting to the judge.

     d.   Supervised and knowingly condoned the intimidation and coercion of witnesses in order to fabricate evidence against Carson, and by extension, Plaintiffs. Defendants **FERREIRA**, **BUNCH**, **JACOBSON**, **EVERS**, and **BROWN** used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information), and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson, and by extension, Plaintiffs.

     e.   Following the false and unlawful arrest, Fladager conducted a press conference where Plaintiffs were defamed and accused of being accessories to murder. For the first time in Stanislaus County history, the entire arrest warrant, including the personal identifying information and social security numbers of the accused, was posted online. This is clear evidence that Fladager was malicious in her arrest and prosecution of Carson, and by extension, Plaintiffs.

     f.   Acted outside her role as prosecutor and acted as supervisor, investigator and administrator. Defendant Fladager gave legal advice to investigators and police officers including advice that they had probable cause to search and arrest Plaintiffs, engaged in the planning, drafting and execution of search and arrest

warrants based on evidence she knew was false, coerced and fabricated in order to search and to arrest Plaintiffs, and otherwise fully participated in and advised the officers and investigators throughout the investigation in which probable cause never existed to arrest Plaintiffs. Fladager knew there was not probable cause to suspect Plaintiffs of any crime, yet she falsely and maliciously arrested and prosecuted them based on fabricated evidence in order to fulfill a retaliatory scheme to destroy Frank Carson.

57. **Defendant David Harris:** Defendant Harris oversaw the entire investigation from its inception. Harris decided the investigation was a "blue star" confidential case that required specialized attention. Harris's role as supervisor was to "monitor and shepherd" the investigation to its conclusion. Harris ratified and condoned unconstitutional policies and decision-making in the District Attorney's office including the coercion of criminal defendants to give false statements against Carson in exchange for their cases being dropped or significantly reduced. Almost every witness that in any way implicated Frank Carson, and Plaintiffs by extension, was a career criminal whose own criminal charges were dropped or significantly reduced in exchange for testimony against Carson. No witness implicated Georgia or Christina DeFilippo. During the investigation Harris, among other things, personally:

    a. Relayed updates directly to Fladager.

    b. Participated in regular briefings on the investigation and was given additional briefings on any significant development.

    c. Retained junk cell phone expert Jim Cook to provide misleading evidence used to frame Carson and Plaintiffs for murder.

    d. Directly supervised **BUNCH**, **JACOBSON**, and **BROWN**.

    e. Was informed of all witnesses law enforcement was interviewing.

    f. Reviewed and edited all affidavits for wiretap applications.

    g. Read all reports and transcripts of witness interviews.

    h. Approved the use of informants.

    i. Held meetings about the investigation with the heads of other involved law

enforcement agencies.

j.  Attended a May 5, 2012 meeting with **FLADAGER** and Judge Cordova
    regarding wiretaps.

k.  Was intimately involved in drafting the fabricated and misleading arrest warrant
    to frame Frank Carson and Plaintiffs for murder and reviewed the final draft
    prior to submitting to the judge.

l.  Supervised and knowingly condoned the intimidation and coercion of witnesses
    in order to create fabricated evidence against Carson and Plaintiffs by extension.
    Defendants **BUNCH**, **JACOBSON**, **EVERS**, and **BROWN** used unduly
    coercive interviewing techniques, such as prolonged interrogation, contamination
    (the feeding non-public information to the witnesses and then having the witness
    adopt that information), and used promises of leniency in the witnesses' own
    criminal charges in order to fabricate evidence against Carson, which was used
    to link Plaintiffs to the murder.

m.  Acted outside his role as prosecutor and acted as a supervisor, investigator and
    administrator. Defendant **HARRIS** gave legal advice to investigators and police
    officers including advice that they had probable cause to search and arrest
    Plaintiffs, engaged in the planning, drafting and execution of search and arrest
    warrants based on evidence they knew was false, coerced and fabricated
    evidence in order to search and to arrest Plaintiffs, and otherwise fully
    participated in and advised the officers and investigators throughout the
    investigation in which probable cause never existed to arrest Plaintiffs. Harris
    knew there was not probable cause to suspect Plaintiffs of any crime, yet he
    falsely and maliciously arrested and prosecuted them based on fabricated
    evidence in order to fulfill a retaliatory scheme to destroy Frank Carson.

58. **Defendant MARLISSA FERREIRA:** Ferreira took over for **HARRIS** in 2015
when he was accused of jury tampering by Carson. Ferreira ratified and condoned
unconstitutional policies and decision-making in the District Attorney's office including the

coercion of criminal defendants to give false statements against Carson, and by extension Plaintiffs, in exchange for their cases being dropped or significantly reduced. Almost every witness that in any way implicated Frank Carson, and Plaintiffs by extension, was a career criminal whose own criminal charges were dropped or significantly reduced in exchange for testimony against Carson. No witness implicated Georgia or Christina DeFilippo. During the investigation Ferreira, among other things, personally:

    a.   Participated in regular briefings on the investigation.

    b.   Retained junk cell phone expert Jim Cook to provide misleading evidence used to frame Carson and Plaintiffs for murder.

    c.   Directly supervised lead investigators including **BUNCH**, **JACOBSON**, and **BROWN**.

    d.   Was informed of all witnesses law enforcement was interviewing.

    e.   Reviewed and edited all affidavits for wiretap applications and addendums from June 2012 through 2015.

    f.   Reviewed and edited all affidavits for wiretap applications beginning 2015.

    g.   Read all reports and transcripts of witness interviews.

    h.   Was intimately involved in drafting the fabricated and misleading arrest warrant and reviewed and approved the final draft prior to submitting to the judge.

    i.   Supervised and knowingly condoned the intimidation and coercion of witnesses in order to create false evidence against Carson and by extension, Plaintiffs. Defendants **BUNCH**, **JACOBSON**, **EVERS**, and **BROWN** used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information), and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson and by extension, Plaintiffs.

    j.   Used techniques that were so coercive and abusive that she knew, or was deliberately indifferent to the fact that those techniques would yield false testimony

to criminally prosecute Carson and Plaintiffs, such as: (i) telling Beverly Woody her son Woody would get life in prison if their "stories" did not match; (ii) Conspiring with **JACOBSON** and **BUNCH** to allow Beverly Woody to pass notes to Robert Woody out of the sight of security cameras while he was imprisoned, which told Robert Woody to implicate Carson, Walter Wells, and Plaintiffs in his in-court testimony, (iii) bringing Robert Woody to the location of Kauffman's remains while evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession; (iv) met with **BUNCH, JACOBSON**, Woody, and Beverly Woody after court to discuss and plan Beverly Woody's fabricated testimony; and (v) ignoring Beverly Woody when Beverly Woody told **FERREIRA** that she lied on the stand to help Woody.

k. Supervised and knowingly condoned the intimidation and coercion of witnesses in order to create fabricated evidence against Carson and used to implicate Plaintiffs in the murder. Defendants Bunch, Jacobson, Evers, and Brown used unduly coercive interviewing techniques, such as prolonged interrogation, contamination (the feeding non-public information to the witnesses and then having the witness adopt that information) and used promises of leniency in the witnesses' own criminal charges in order to fabricate evidence against Carson, and Plaintiffs by extension.

l. Helped create Jim Cook's inherently misleading maps by instructing him which points to include/represent on his maps and which to exclude.

m. Acted outside her role as prosecutor and acted as a supervisor, investigator and administrator. Defendant Ferreira gave legal advice to investigators and police officers including advice that they had probable cause to search and arrest Plaintiffs, engaged in the planning, drafting and execution of search and arrest warrants based on evidence they knew was false, coerced and fabricated evidence in order to search and to arrest Plaintiffs, and otherwise fully participated in and advised the officers and investigators throughout the

investigation in which probable cause never existed to arrest Plaintiffs. Ferreira knew there was not probable cause to suspect Plaintiffs of any crime, yet she falsely and maliciously arrested and prosecuted them based on fabricated evidence in order to fulfill a retaliatory scheme to destroy Frank Carson.

n.  Defendant **FERREIRA** committed the following acts while acting outside her role as a prosecutor:

    i.  Ferreira and **BUNCH** went to visit a witness, TJ Singh, and told him not to sign a conflict waiver in order to deprive Carson's stepdaughter, Christina DeFilippo, of legal representation.

    ii.  Ferreira repeatedly asked when Carson's wife, Georgia, was going to run out of money for her defense and repeatedly told defense attorneys for Georgia and Christina that if they would give testimony implicating Carson in the crime, the charges against them would be dropped. Georgia and Christina refused to do so, as it would have been a lie.

    iii.  Ferreira visited the owner of an antique mall and asked if Frank and Georgia ever sold guns, to which she was told no. Ferreira never did a report on this and never disclosed it as Brady material.

    iv.  Ferreira acted as a primary investigator and participated in the interviews of witnesses and the fabrication of their testimony, including witness Ron Cooper who Carson allegedly solicited for his "muscle" to make an example of thieves on his property.

    v.  Ferreira accompanied Robert Woody to the location of Kauffman's remains while evidence flags showed the exact location to create the false impression that Woody knew where they body was and to support his false confession.

59.  **Defendant KIRK BUNCH:** As the lead case agent for the Stanislaus County District Attorney's Office, Bunch formed the team of investigators looking into Kauffman's disappearance, assigned tasks to other investigators on the task force, and oversaw the entire investigation. Bunch was the first person to approach Defendant **HARRIS** about Carson's

alleged involvement in Kauffman's disappearance. Bunch made critical decisions throughout the investigation regarding who the task force considered a suspect or person of interest, when suspects or persons of interest were cleared, and which leads to pursue throughout the investigation. In his position as the leader of the investigation, Bunch coordinated the wrongful acts of Defendants for the express purpose of securing a criminal conviction against Frank Carson, and by extension Plaintiffs, even though he knew there was no probable cause to charge them with murder or with being an accessory to murder. No witness implicated Georgia or Christina DeFilippo. During the investigation Bunch, among other things, personally:

    a.  Conducted approximately 400 witness interviews in which he used threatening and coercive statements to purposefully fabricate false evidence against Carson, and Plaintiffs by extension. (see ¶¶ 35, 38-44.)

    b.  Prepared, or participated in the preparation of arrest warrant that he knew or should have known contained numerous fabrications, false or misleading statements and omissions that the reviewing judge would have found significant in deciding whether to issue the arrest warrant. For example, in the arrest warrant, Bunch included statements attributed to witness John Paden, who Bunch interviewed on 3/11/14. When the warrant was made public, Paden called Bunch and told him that Bunch was lying about what Paden had reported. Bunch replied, "Don't you want to help out a murder investigation?"

    c.  Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrant for the murder of Korey Kaufman in a direct attempt to pressure Plaintiffs and the other innocent people accused of involvement in Kauffman's murder to manufacture fabricated accusations against Frank Carson and Plaintiffs by extension. Bunch included the murder charges and an enhancement for lying in wait in the arrest warrant specifically to hold Carson, Plaintiffs, and others without bond in an attempt to secure a false confession (fabricated evidence) against Carson or from Carson himself.

    d.  Used techniques that were so coercive and abusive that he knew, or was

deliberately indifferent to the fact that those techniques would yield false testimony to criminally prosecute Carson and Plaintiffs, such as: (i) threatening Robert Woody with life imprisonment or the death penalty; (ii) reciting to Robert Woody what to say to secure a false confession that implicated Frank Carson, (iii) conspiring with **JACOBSON** and **FERRERIRA** to allow Beverly Woody to pass notes to Robert Woody out of the sight of security cameras while he was imprisoned, which told Robert Woody to implicate Carson, Walter Wells, and others in his in-court testimony, (iv) holding group meetings with **MARLISA FERREIRA**, Beverly Woody, and Robert Woody at the Stanislaus County District Attorney's Office while Robert Woody was incarcerated to provide him with supposed facts for his in court testimony, (v) bringing Robert Woody to the location of Kauffman's remains while evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession and (vi) met with **FERREIRA, JACOBSON**, Woody, Beverly Woody after court to discuss and plan Beverly Woody's fabricated testimony.

e. Personally and deliberately continued to investigate Carson, and by extension Plaintiffs, and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 35 of this Complaint). For example, Bunch interviewed witness Kimberly Stout, Kauffman's neighbor and childhood friend on 3/11/2014. Stout reported that Cooley told her that he was mad at Kauffman because he suspected Kauffman was having an affair with Cooley's girlfriend, Eula Keyes. Around the time Kauffman went missing, Keyes told Stout that Cooley, "set-up Kauffman" and then Keyes stopped coming over to Stout's house. Bunch also interviewed Edward Regua on May 13, 2014, and March 26, 2015. Regua reported seeing Kauffman getting into Tina Carlos' car the night Kauffman disappeared. A woman matching Carlos' description was reported dumping a body wrapped in trash bags shortly after Kauffman's

disappearance.

f. Personally and deliberately continued to interview Robert Woody despite his inconsistent and contradictory statements because he understood that they did not have probable cause to charge Carson or Plaintiffs with murder and therefore desperately needed Woody's false confession to implicate him.

g. Continued to hold regular briefings focusing the investigation on Carson and Plaintiffs, despite overwhelming exculpatory evidence. Since as early as April of 2012, when Deputy Kenneth Barringer first conducted interviews to investigate Kauffman's disappearance, Bunch ignored alternative theories and suspects (including the suspects summarized in ¶ 35 of this Complaint) for the express purpose of securing a criminal conviction against Frank Carson and by extension Plaintiffs.

h. Helped create Jim Cook's inherently misleading maps by instructing him which points to include/represent on his maps and which to exclude.

i. Destroyed the evidence on the game cameras showing McMillan was in the area where Kauffman's body was found.

j. At the preliminary hearing, Bunch disobeyed an order from the Court and improperly spoke with witness Linda Burns about her testimony.

k. Testified at the preliminary hearing.

60. **Defendant STEVE JACOBSON:** Jacobson was an investigator for the Stanislaus County District Attorney's Office. He was assigned by **HARRIS** to the task force investigating Kauffman's disappearance. He joined the murder investigation at its inception and improperly sought to secure a criminal conviction against Frank Carson, and by extension Plaintiffs, even though he knew there was no probable cause to charge them with murder or with being an accessory to murder. Jacobson had a troubled 20-year long relationship with Carson, who had previously attacked Jacobson's professionalism, run an advertisement in a local paper seeking information about Jacobson's misconduct, sued him for assault, and sought contempt charges against Jacobson in another case. During the investigation Jacobson, among

other things, personally:

     a.   Prepared, or participated in the preparation of arrest warrants for Plaintiffs that he knew or should have known contained numerous fabrications, false or misleading statements and omissions that the reviewing judge would have found significant in deciding whether to issue arrest warrants.

     b.   Reviewed all the wiretap affidavits.

     c.   Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrants to elicit manufacture false accusations (fabricated evidence) against Frank Carson and Plaintiffs.

     d.   Used techniques that were so coercive and abusive that he knew, or was deliberately indifferent, that those techniques would yield false testimony, such as: (i) calling and arranging for Robert Woody's mother, Beverly Woody, to meet with him at the Stanislaus County District Attorney's Office while he was incarcerated without bail on charges for first degree murder to tell Robert Woody what investigators wanted him to say in court, (ii) pressuring and facilitating Beverly Woody to show Robert Woody, while he was in jail, a note telling him to implicate Carson and Plaintiffs during his in-court testimony, (iii) instructing Beverly Woody how to position herself while she showed Robert Woody the note so that the video camera in the jail would not capture  this exchange, (iv) threatening Robert Woody that he would "never…see [his] kids again except when they come visit [him] in jail" and not "be around" to "comfort [his] mother when she needs [him] the most" to garner a false confession, and (v) bringing Robert Woody to the location of Kauffman's remains while evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession.

     e.   Met with **FERREIRA, BUNCH**, Woody, Beverly Woody after court to discuss and plan Beverly Woody's fabricated testimony.

     f.   During the preliminary hearing, Defendant Jacobson procured further false

testimony from Robert Woody because there was no evidence that Frank Carson and CHP Officer Walter Wells were on Carson's property the night of the alleged murder. Woody had repeatedly told investigators that Carson had never asked them to hurt anyone stealing from his property. Defendant Jacobson had Robert Woody's mother, Beverly Woody, hold up a note to Robert Woody during a jail visit telling him they needed more implicating Carson and Wells. Following this, Woody changed his story (yet again) and said Carson and Wells were on the property the night Kauffman was murdered. Woody recanted this statement several days later.

g. Personally and deliberately continued to investigate Carson and Plaintiffs, and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 35 of this Complaint).

h. Personally and deliberately continued to interview Robert Woody despite his inconsistent and contradictory statements because he understood that they did not have probable cause to charge Carson and Plaintiffs with murder and therefore desperately needed Woody's false confession to implicate them.

i. Deliberately prepared fabricated or misleading reports that were used to charge and prosecute Plaintiffs. For example, in a report dated September 16, 2015, Jacobson claimed that Robert Woody's description of where Kauffman's remains were buried was "extremely accurate." However, when Woody purportedly took officers where the Kauffman remains were (they had already been located by police), Jacobson personally led Woody to the exact spot where officers had placed evidence flags and had Brown stand feet from the spot Kauffman's remains were found. This was done to create the knowingly false impression that Woody knew where the body was located. In fact, Woody had no idea where the body was, which is why Jacobson, **BUNCH**, **BROWN**, and the others who were present (including **FERREIRA**) led Woody by the hand to the location where the body was found.

j.    Testified at the preliminary hearing.

61.    **Defendant JON EVERS**: Jon Evers started working on the investigation of Kauffman's disappearance at least as early as May 2012 and conducted over 400 hundred interviews in which he used threatening and coercive statements to purposefully fabricate false evidence against Plaintiffs. No witness implicated Georgia or Christina DeFilippo.  As the City of Modesto's sole Detective on the Kauffman investigation, Evers coordinated with BUNCH and the County of Stanislaus District Attorneys' Office daily to commit the violations alleged in this Complaint. Among other things, Evers personally:

a.    Participated in fabrication of evidence from witness Scott Rollins by hiding evidence of Michael Cooley's motive to kill Korey Kaufman.  Rollins knew that Cooley and Cooley's girlfriend's son, Keith Hobbs, were seen beating up Kauffman.  Rather than investigate whether Cooley and Hobbs killed Kauffman, Defendant Evers solicited a false statement from Rollins that he had seen the Athwals in a fight with Kauffman.  This shows the lengths the Defendants went to cover up credible leads to try to frame Carson and Plaintiffs for murder.

b.    Spoke with **BROWN** about the arrest warrant, knew it contained fabrications, false and misleading statements and omissions, and did nothing to correct it.

c.    Participated in the decision regarding what charges to pursue against Plaintiffs.

d.    Participated in the decisions to rule out and not investigate the drug dealers and gang members who had threatened Korey Kauffman.

e.    Used interview techniques that were so coercive and abusive that Evers knew, or was deliberately indifferent to the fact, that those techniques would yield false testimony. On March 1, 2014, Evers personally participated in an interview of Robert Woody in which he and Bunch recited to Robert Woody what to say to secure a false confession that implicated Frank Carson and Plaintiffs.  Evers knew that Robert Woody had repeatedly denied any involvement in the murder and did not adopt the story being fed to him until after an unrecorded 20-minute

bathroom break. Evers knew that the judge reviewing the arrest warrant affidavit would want to know about this information yet did not ask that it be disclosed.

    f.    Participated in the March 3, 2014, and February 6, 2016, interviews of Woody as Woody continued to change his story about how Kauffman died.

    g.    Participated in bringing Robert Woody to the location of Kauffman's remains where evidence flags planted in the ground showed where Kauffman's body had been discovered to create the false impression that Woody knew where they body was and to support his false confession.

    h.    Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrant to manufacture false accusations against Frank Carson and Plaintiffs by extension.

    i.    Continued to investigate Carson and Plaintiffs, and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 35 of this Complaint) to secure a criminal conviction of Frank Carson and Plaintiffs. For example, Evers was present for the witness interview of Kimberly Stout on March 11, 2014 where she told investigators Cooley told her he was mad at Kauffman for having an affair with his girlfriend Eula Keyes. Evers also interviewed Christa Mote on June 3, 2014 and March 14, 2015, where she reported overhearing Domenic Saldana say he disposed of Kauffman's body, wrapped in trash bags, using her car.

    j.    Testified at the preliminary hearing.

62.    **Defendant CORY BROWN**: Brown was the lead investigator from the Stanislaus County Sheriff's department on the task force investigating Kauffman's disappearance beginning in 2012. Upon joining the task force, Brown familiarized himself with the existing evidence by reviewing all reports and speaking with investigators. Brown became the affiant and manager of the wiretaps for Plaintiffs. He also authored the arrest affidavit for Plaintiffs. Brown prepared the affidavits with assistance from the other investigators on the task

force. In addition to authoring the warrants, Brown took the lead on many of the daily task force briefings. Among other things, Brown personally:

    a.    On September 20, 2013, defendant Brown interviewed Christina DeFilippo outside her painting class at the Pratt Institute in Brooklyn, New York. Christina requested a lawyer but was intimidated into talking to the police without a lawyer and told she wouldn't need a lawyer unless she was afraid of being arrested for something. Brown took Christina to a basement room, falsely imprisoning her and denying her constitutional right to an attorney. She was further intimidated when Brown told Christina that they would make her life miserable if she did not cooperate.

    b.    Signed the arrest warrant affidavit knowing that it contained numerous fabrications, false and misleading statements, and blatant omissions of exculpatory information (including the suspects summarized in ¶ 35 of this Complaint). For example, Brown failed to inform the Court that critical cell phone tower data was "**inherently misleading**." Brown also recently admitted in deposition: "**My limited understanding of how Jim Cook conducts his business is not consistent with the training that I've received**." Yet, none of this was disclosed to the Court in Brown's arrest warrant affidavit.

    c.    Brown failed to disclose in the arrest warrant affidavit the many suspects who had recently threatened to kill Kauffman.

    d.    The affidavit fails to disclose that at least three key witnesses mentioned in the affidavit (Mike Cooley, Eula Keyes, and Keith Hobbs)—the last people who saw Kauffman alive—were each found to be "deceptive" about their knowledge of Kauffman's disappearance when voice stress analysis tests were administered. Brown knew this because he was present during the tests and reported on the results. He had no explanation in deposition for why he failed to disclose this critical information.

e. Prepared, or participated in the preparation of, the specific charges to be included in the arrest warrants to manufacture false accusations against Frank Carson and Plaintiffs.

f. Deliberately continued to investigate Carson and Plaintiffs, and purposefully ignored exculpatory evidence and other suspects (including the suspects summarized in ¶ 35 of this Complaint). For example, **BROWN** interviewed Charlie Odell on February 8, 2013. Odell reported encountering Cooley covered in mud after disposing Kauffman's body and that Cooley confessed to Kauffman's murder. That same day, **BROWN** interview Keith Hobbs who also said Cooley told him he was involved in Kauffman's murder. Additionally, Brown continued to investigate Carson and Plaintiffs even though the wiretaps on cell phones were terminated early when no pertinent evidence was collected and ignored, what he later described as a reasonable inference, that Kauffman may have left the Carson property the night he was last seen after stealing pipes from Carson's property because the wheelbarrow he arranged to be dropped off near Carson's property was gone.

g. Used techniques that were so coercive and abusive that he knew, or was deliberately indifferent, that those techniques would yield false testimony, such as bringing Robert Woody to the location of Kauffman's remains while Brown stood near where the remains were found and evidence flags showed the location to create the false impression that Woody knew where they body was and to support his false confession.

h. Brown failed to inform the Court in his arrest warrant affidavit that Woody—the only purported eye witness and one of the two people who supposedly buried Kauffman where his remains were found—had no clue where the body was, or how to get there. Indeed, he recently admitted in deposition that "we didn't receive any information from Woody on how to get to the site where Kauffman's remains were found" because Woody "didn't know how to get there." Thus,

when Brown drove Woody to where Woody was supposed to show them where the body was buried, Woody didn't show them anything. Instead, Brown used GPS to find the road where authorities had located the body and led Woody to a specific location where police evidence flags were stationed in advance of Woody's visit. The site visit was a charade, and Defendants knew it.

       i.   Testified at the preliminary hearing.

## VI.   <u>CONCLUSION</u>

63.    There was never any evidence that a murder had occurred on Frank Carson's Turlock property. Nor was there any evidence that either Georgia or Christina had committed any crime whatsoever. There was no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found on Carson's property where the Defendants claimed the murder occurred. There was allegedly a gunshot that no one heard in a neighborhood full of people. There was no blood, hair, clothing fibers, fingerprints, spit, sweat, or any such thing found at the Pop N Cork liquor store where the body was allegedly taken and buried for months until it was supposedly dug up by Woody and the Athwals and taken to the mountains. This burial allegedly occurred in a crowded neighborhood with no witnesses, and where numerous law enforcement frequented, yet no one so much as smelled a decomposing body that was allegedly a mere 14 inches underground right behind the backroom where law enforcement regularly gathered to drink after their shifts. All of the testimony used to support the Defendants' theory was elicited from the career criminals and could easily have been proven false by even a cursory investigation of physical evidence.

64.    All charges against the Plaintiffs were dismissed on April 10, 2017. Carson, the Athwal brothers, and the three CHP officers were ultimately acquitted of all charges by a jury in 2019. Following the Carson trial Defendants from the Stanislaus County DA's Office further defamed Plaintiffs in the press by continuing to accuse them of being involved in a murder.

## VII.   <u>DAMAGES</u>

65.    Georgia DeFilippo has an extraordinary amount of economic damages, including $390,000 in bail, approximately $500,000 in attorneys' fees, $87,732.56 in court costs, lost

income, and severe emotional distress, including being housed in a maximum-security facility for 50 days, while innocent of any crime.  Christina DeFilippo had just graduated with a Master of Fine Arts degree and intended to pursue a career as an artist and teacher.  However, due to the press surrounding her arrest, it is unlikely she will ever be hired to teach.  Georgia and Christina have become overwhelmed with paranoia, depression, and anxiety because of the defendants' witch hunt against them and the continued efforts to violate their privacy by seeking search warrants for their phones and computers.  Georgia and Christina live in fear of the defendants' use of power to try to deprive them of their lives and liberty.

### VIII.   ACCRUAL AND TOLLING

66.    As a general rule, claims accrue when all elements of the claim, including damages, have occurred.  *Deem v. William Powell Co.*, 33 F.4th 554, 560 (9th Cir. 2022).  Plaintiffs allege continuing violations dating back to the 2012 murder investigation and culminating with their 2015 false arrest and malicious prosecution, continuing through the dismissal of all charges against them in 2017.  Plaintiffs could not have properly assessed their various claims and damages against the Defendants named herein until the conclusion of their preliminary hearing, when the court declined to hold them over for trial.

67.    Upon Plaintiffs' arrest for murder on August 14, 2015, Plaintiffs state law claims and Section 1983 claims were tolled pending the resolution of criminal charges against them.  *Cross v. City & Cty. of San Francisco*, 386 F. Supp. 3d 1132, 1142 (N.D. Cal. 2019); Gov. Code § 945.3.  This includes claims brought against defendants **FLADAGER**, **HARRIS** and **FERREIRA** because they are not being sued in their role as District Attorneys, who are excluded from Gov. Code § 945.3, rather they are being sued for conduct performed in their roles as supervisors and investigators.  District Attorney investigators are "peace officers" under California Penal Code § 830.1(a), thus § 945.3 tolling is applicable.

68.    Any claims that were not tolled pursuant to California Government Code Section 945.3, are entitled to equitable tolling under California law, "to prevent the unjust technical forfeiture of causes of action, where the defendant would suffer no prejudice." *Jones v. Cnty. of San Diego*, 2022 WL 3084588 (S.D. Cal. 2022) quoting *Lantzy v. Centex Homes*, 31 Cal. 4th

363, 370, (2003). Defendants here can claim no prejudice as they received notice of Plaintiff's claims based on continuing violations on October 3, 2017, (five months and twenty-three days after conclusion of preliminary hearing), when Plaintiffs filed claims with Stanislaus County and City of Modesto pursuant to California Government Code Section 911.2.

69. Plaintiffs' first cause of action for unlawful search and seizure based on judicial deception in violation of their Fourth Amendment rights, accrued when the arrest warrant affidavit became reasonably available to each Plaintiff. The affidavit became reasonably available to Georgia, who was imprisoned following her initial arrest until October 4, 2015, and to Christina who was released on bail the same day of her arrest, August 14, 2015, no sooner than October 2015, when the preliminary hearing began, and their respective criminal attorneys received copies of the affidavit through the discovery process.

70. Plaintiffs' second cause of action for malicious prosecution accrued at the conclusion of Plaintiff's preliminary hearing on April 10, 2017, when all charges against them were dismissed.

71. Plaintiffs' third cause of action for deliberate fabrication of evidence in violation of the Fourteenth Amendment right to due process accrued at the conclusion of Plaintiff's preliminary hearing on April 10, 2017, when all charges against them were dismissed.

72. Plaintiffs' fourth cause of action for Section 1983/*Monell* violations accrued at the conclusion of Plaintiff's preliminary hearing on April 10, 2017. Plaintiffs only became aware of the various bad acts alleged herein that form the basis for this cause of action, through testimony and evidence presented during the preliminary hearing. It was at the conclusion of the preliminary hearing that Plaintiffs discovered all the facts pertaining to Stanislaus County's wide-spread unconstitutional customs and policies as well as Defendants Fladager and Harris' deliberate indifference to providing adequate training and supervision of subordinates during the investigation and preliminary hearing.

73. Plaintiffs' fifth cause of action for violation of the Bane Act, accrued at the conclusion of Plaintiff's preliminary hearing on April 10, 2017, when all charges against them were dismissed.

74. Plaintiffs' sixth cause of action is for false arrest and false imprisonment. Plaintiffs' false arrest claim accrued on August 14, 2015, the date of arrest. Christina DeFilippo's false imprisonment claim accrued on August 14, 2015, the date she was released on bail. Georgia DeFilippo's false imprisonment claim accrued on October 4, 2015, the date she was released on bail.

75. Plaintiffs' seventh cause of action for intentional infliction of emotional distress accrued at the conclusion of Plaintiff's preliminary hearing on April 10, 2017, when all charges against them were dismissed. Plaintiffs were maliciously prosecuted due to their association with Carson, their now deceased step-father and husband. All acts occurring from the beginning of the murder investigation through the preliminary hearing constituted continuing violations that caused Plaintiffs' severe emotional distress.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 for Fourth Amendment Violations**
**Unlawful Search and Seizure**
**[Plaintiffs Against Fladager, Harris, Ferreira, Bunch, Brown, and DOES 1-25]**

76. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

77. In doing the acts complained of herein, Defendants, and/or each of them, acted under color of law to deprive Plaintiffs of certain constitutionally protected rights, including, the right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States and the right to be free from arrest without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States.

78. Defendants **BUNCH** and **BROWN** presented an arrest warrant that was so clearly lacking in probable cause that any reasonable officer would have known that they did not have probable cause to arrest Plaintiffs.

79. As set forth in paragraph 49, Defendants **JACOBSON**, **BUNCH**, **BROWN**, and **EVERS** intentionally or in reckless disregard of the truth made one or more material misrepresentations, omissions and fabrications in an arrest warrant affidavit submitted to a judge.

80.     As set forth in paragraph 55-58, Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** were acting as supervisors of **BUNCH**, **BROWN**, and **EVERS** either directed their subordinates to submit these deceptive warrants, and/or failed to intervene to stop their subordinates from violating Plaintiffs' constitutional rights.  Defendants **FLADAGER**, **HARRIS**, and **FERREIRA**'s conduct was so closely related to the constitutional deprivations as to be the moving force behind the violations of constitutional rights.

81.     These violations are compensable pursuant to 42 U.S.C. 1983.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages, including, but not limited to, legal expenses, economic losses, loss of reputation, emotional distress, and other damages.

82.     In doing the things alleged herein, the Defendants' conduct was despicable.  The Individual Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 for Fourth Amendment Violations**
**Malicious Prosecution in Violation of the Fourth Amendment**
**[Plaintiffs Against Defendants Fladager, Harris, Ferreira, Bunch, Jacobson, Evers, Brown]**

83.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

84.     In doing the acts complained of herein, **FLADAGER**, **HARRIS**, **FERREIRA**, **BUNCH**, **JACOBSON**, **EVERS**, **BROWN** and DOES 1-25, inclusive, and/or each of them, acted under color of law to deprive Plaintiffs of certain constitutionally protected rights, including, but not limited to, the right to be free from arrest and prosecution without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States.

85.     Defendants were actively involved in causing the initiation of criminal proceedings against Plaintiffs without probable cause and with malice and reckless indifference.

86.      As set forth in paragraphs 56-58, Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** supervised the entire malicious investigation that led to the malicious prosecution. As supervisors, they were briefed regularly on the status of the investigation, participated in

witness interviews, read police reports – including exculpatory witness statements, and reviewed and/or edited the arrest warrant that contained numerous false/misleading statements and omissions of exculpatory information.  They approved and/or ratified the charges included against Carson and the eight other innocent individuals accused of murdering Kauffman knowing the result of the charges would be imprisonment without bail.

87.    During the preliminary hearing, the prosecution was admonished by the Judge for repeated discovery violations.  In 2016, Defendant **FERREIRA** turned over 53 discs of previously undiscovered investigative materials, including scores of exculpatory evidence.  This was done just before a new law came into effect that would have made such a withholding a felony.  Among this evidence was a polygraph test given to Woody in April 2014 that showed he was being truthful when he denied involvement in the Kauffman murder.

88.    In a July 2017 email, **FERREIRA,** acting as a supervisor and co-conspirator, gave **BUNCH** "unfettered authority" to decide what discovery should go out to the defense and when knowing that BUNCH would use that authority to  destroy or withhold exculpatory evidence from the Defense.

89.    The criminal proceedings were terminated in Plaintiffs' favor for lack of probable cause.

90.    As set forth in paragraphs 35-37, 45-49 and 59-62, Defendants **BUNCH**, **JACOBSON**, **BROWN**, and **EVERS**, all participated in drafting the arrest warrant that contained numerous false/misleading statements and omissions of exculpatory information.

91.    As set forth in paragraphs 38-44, Defendants **BUNCH**, **JACOBSON,** and **EVERS** participated in obtaining the coerced fabricated confession from Robert Woody.

92.    As set forth in paragraphs 58-62, Defendants **FERREIRA**, **BUNCH**, **JACOBSON**, **EVERS**, and **BROWN** participated in leading Woody to the location the Kauffman remains were found to further support his false confession for the express purpose of convicting Carson of murder.

93.    No reasonable person would have believed that there were grounds for Plaintiffs to be arrested or prosecuted and Defendants, by their conduct, intended to deprive Plaintiffs of

their constitutional right to be free from unreasonable seizures under the Fourth Amendment.

94.     As set forth in paragraphs 56-58, Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** are sued in their capacity as administrators, supervisors and investigators, for their acts alleged above and not for any acts in their roles as prosecutors in the presentation of the state's case against Carson and Plaintiffs.

95.     These violations are compensable pursuant to 42 U.S.C. 1983.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages, including, but not limited to, legal expenses, economic losses, loss of reputation, emotional distress, and other damages.

96.     In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

<u>**THIRD CAUSE OF ACTION**</u>
**42 U.S.C. § 1983 for Fourteenth Amendment Violations**
**Right to Due Process, Deliberate Fabrication**
**[Plaintiffs Against Fladager, Harris, Ferreira, Bunch, Jacobson, Evers, Brown]**

97.     Plaintiffs incorporate by reference and reallege each and every allegation contained in paragraphs 1-7; 38-46; 47(h), (m); 48; 49(a)-(o); 53; 56(b)(c); 57(c)(k); 58(b), (h), (i), (j), (k), (l), (m)(i)-(m)(v); 59(b), (d), (e), (h), (i), (k); 60(a), (d), (e), (f), (i), (j); 61(a), (b), (e), (f), (g), (i), (j); and 62 (b), (c), (d), (g), (h), (i).

98.     In doing the acts complained of herein, **FLADAGER, HARRIS, FERREIRA BUNCH, JACOBSON, EVERS, BROWN**, and Does 1-25, inclusive, and/or each of them, acted under color of law to deprive Plaintiffs of certain constitutionally protected rights, including, but not limited to, Plaintiffs' right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States.  The right to be free from arrest without probable cause guaranteed by the Fourth Amendment to the Constitution of the United States, the right to due process of law by being informed of all exculpatory evidence in the criminal case against Plaintiffs guaranteed by the Fourth and Fourteenth Amendments of the Constitution of the United States.  The right to be free from

criminal charges based on false evidence that was deliberately fabricated by the defendant guaranteed by the Fourteenth Amendment.

99. Defendants were deliberately indifferent to Plaintiffs innocence and continued to investigate and prosecute Plaintiffs even though they knew, or should have known, they lacked probable cause. Defendants knowingly and willfully ignored or did not adequately investigate numerous other far more likely suspects. (*supra*, ¶ 35(a)-(n).) Defendants also presented false and misleading evidence regarding the number of times Korey Kauffman was shot.

100. Defendants fabricated the false and misleading testimony of Robert Woody and the prosecutions purported cell phone "expert" in the arrest warrant affidavit and at their preliminary hearing

101. Defendants used investigative techniques with Robert Woody that were so coercive and abusive that they knew, or should have known, those techniques would yield fabricated information.

102. Beverly Woody testified in deposition that **BUNCH**, **JACOBSON**, and Prosecuting Attorney Marlissa **FERREIRA** would frequently speak with her and her son, Robert Woody, about what to say in court. She testified that she was told that she had to tell her son, Robert Woody, that he had to say that Wells and Carson were involved with Kauffman's disappearance. She testified that Ferreira told her that her son would only get 5 years in prison instead of life or the death penalty if they cooperated in this fashion.

103. Defendants also fabricated evidence through the deliberate omission of material information from the arrest warrant affidavit by "group consensus" according to defendant **BROWN** (*supra*, ¶¶ 46; 49(a)-(o).).

104. As in paragraph 61(a), Defendant **EVERS** fabricated evidence from witness Scott Rollins by hiding evidence of Michael Cooley's motive to kill Korey Kaufman.

105. Defendants **BUNCH**, **JACOBSON**, **EVERS**, **BROWN**, and DOES 1-25, failed to disclose highly exculpatory evidence to prosecutors even though they knew or should have known or acted with reckless disregard for the fact that withholding such evidence would result in constitutional deprivations of the Plaintiffs. In 2016, more than one year after Plaintiff's

arrest and ten months into the preliminary hearing, Defendant **BUNCH** and **FERREIRA** turned over 53 discs of previously undiscovered investigative materials, including scores of exculpatory evidence. This was done just before a new law came into effect that would have made such a withholding a felony. Among this evidence was a polygraph test given to Woody in April 2014 that showed he was being truthful when he denied involvement in the Kauffman murder. **BUNCH** installed and monitored game cameras where Kauffman's remains were found. Drug dealers McMillan and Armstrong were captured on the camera, but footage was deleted withheld from Carson's counsel. In a July 2017 email, **FERREIRA** gave **BUNCH** "unfettered authority" to decide what discovery should go out to the defense and when.

106. Defendants **FLADAGER**, **HARRIS**, and **FERREIRA** were acting as supervisors and investigators when the fabricated evidence was used and when the exculpatory evidence was withheld.

107. The failure of **FLADAGER, FERRIERA,** and **HARRIS** to provide adequate training, supervision, and their ratification and endorsement of the wrongful acts detailed above, caused the unlawful acts complained of herein.

108. Defendants' fabrication of evidence caused Plaintiff Georgia DeFilippo to spent 50 days in jail and caused both Plaintiffs suffered an unusual period of confinement by being forced to sit through an unusually lengthy preliminary hearing until the charges against them were dismissed.

109. These violations are compensable pursuant to 42 U.S.C. 1983. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages, including, but not limited to, legal expenses, economic losses, loss of reputation, emotional distress, and other damages.

110. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

///

///

# FOURTH CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS FOR UNCONSTITUTIONAL CUSTOM OR POLICY, 42 U.S.C. §§ 1983, 1988

### (Plaintiffs Against Defendant Stanislaus County, Fladager and Harris)

111. Plaintiffs hereby reallege and incorporate each and every allegation set forth above as though fully set forth herein.

112. Under the Fourth and Fourteenth Amendment to the United States Constitution, Plaintiffs had a right not to be deprived of life or liberty without due process of law including, but not limited to, unreasonable seizures and searches, use of fabricated evidence, and failure to disclose exculpatory evidence.

113. As set forth in paragraphs 56(a)-(f); 57(a)-(m), Defendants **FLADAGER** and **HARRIS** were final policymakers for Stanislaus County who engaged in the false arrest and malicious prosecution of Plaintiffs and those acts constitute final constitutional policies of the County of Stanislaus.

114. As set forth in paragraphs 56(a)-(f); 57(a)-(m), through their supervisory authority, Defendants **FLADAGER** and **HARRIS** ratified the conduct of their subordinates and they made deliberate choices to consciously disregard the constitutional rights of Plaintiffs to pursue a course of malicious prosecution without probable cause, ignoring more viable suspects.

115. As set forth in paragraphs 56(a)-(f); 57(a)-(m), Defendants **FLADAGER** and **HARRIS** played a significant role in the task force investigation, including receiving regular updates, approving the unlawful course of action investigators took described herein, retaining Cook - a cell phone "expert" that provided inherently misleading evidence to frame Carson and Plaintiffs, and approved the fabricated arrested warrant.

116. As set forth in paragraph 16(a)-(e), Stanislaus County is liable for the deprivation of Plaintiffs' rights protected by the United States Constitution.

117. These violations are compensable pursuant to 42 U.S.C. 1983. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages,

///

1  including, but not limited to, legal expenses, economic losses, loss of reputation, emotional
2  distress, and other damages.

3  **FIFTH CAUSE OF ACTION**
   **Violation of California Civil Code section 52.1**
4  **[Plaintiffs Against All Defendants]**

5  118.    Plaintiffs incorporate by reference and reallege each and every allegation set
6  forth above, as though fully set forth herein.  The defendants acted in concert to carry out a
7  conspiracy to deprive Plaintiffs of their constitutional rights. This continuing course of conduct
8  despite Plaintiffs' obvious innocence was threating, intimidating, and coercive.

9  119.    As set forth in paragraphs 56-58, Defendants **FLADAGER, HARRIS** and
10  **FERREIRA** ratified the conduct of their subordinates and they made deliberate choices to
11  consciously and recklessly disregard the constitutional rights of Plaintiffs to pursue a course of
12  malicious prosecution without probable cause as part of their conspiracy to frame Carson for
13  murder.

14  120.    As set forth in paragraphs 35-49; 53; and 56-58, Plaintiffs allege that the
15  Defendants presented fabricated evidence and significant misstatements and material omissions
16  to a court to secure Plaintiffs' arrest, withheld exculpatory evidence from prosecutors, and
17  caused the initiation of a malicious criminal prosecution against them in violation of their
18  Fourth and Fourteenth Amendment rights under the United States Constitution and
19  corresponding rights under the California Constitution.

20  121.    As set forth in paragraph 38-44, Defendants **BUNCH, JACOBSON** and
21  **EVERS** used threats and coercive interview tactics to secure false statements from Robert
22  Woody with the specific intent to deprive Plaintiffs of their constitutional rights.

23  122.    As set forth in paragraph 59(b), defendant **BUNCH** included fabricated
24  statements attributed to witness John Paden in Plaintiffs arrest warrant with the specific intent to
25  deprive Plaintiffs of their constitutional rights.  When Paden confronted **BUNCH** with the
26  fabrication **BUNCH** merely replied, "Don't you want to help out a murder investigation?"

27  123.    As a result of the ongoing investigation and subsequent malicious prosecution,
28  in the face of their complete innocence, Plaintiffs were subjected to threats, intimidation and

coercion that was independent from the threats, intimidation and coercion inherent in any arrest and detention.

124.     In deliberate indifference to Plaintiffs innocence, defendant **FERREIRA** repeatedly asked when Carson's wife, Georgia, was going to run out of money for her defense and repeatedly told defense attorneys for Georgia and Christina that if they would give testimony implicating Carson in the crime, the charges against them would be dropped (*supra,* ¶ 58(n)(ii).

125.     In deliberate indifference to Plaintiffs innocence, Defendant **BROWN** flew to New York where Christina was attending graduate school with the specific intent to threaten and intimidate her.  Christina requested a lawyer but was intimidated into talking **BROWN** without a lawyer and told she wouldn't need a lawyer unless she was afraid of being arrested for something.  **BROWN** further intimidated Christina when he told her that law enforcement would make her life miserable if she did not cooperate, i.e. give fabricated evidence against Carson. (*supra*, ¶ 62(a)).

126.     In deliberate indifference to Plaintiff's innocence, defendant **BROWN** signed the arrest warrant affidavit knowing that it contained numerous fabrications, misleading statements, and blatant omissions of exculpatory information (including the suspects summarized in ¶ 35 of this Complaint) and participated in deciding the specific charges to bring against Plaintiffs.

127.     Defendants **COUNTY OF STANISLAUS** and **CITY OF MODESTO** are liable under a theory of respondent superior.

128.     As a direct and proximate result of the defendants' wrongful conduct, Plaintiffs have suffered damages, including, but not limited to, legal expenses, economic losses, loss of reputation, emotional distress, and other damages.

129.     In doing the things alleged herein, the defendants' conduct was despicable. The individual defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

# SIXTH CAUSE OF ACTION
### False Arrest/Imprisonment
### [Plaintiffs Against All Defendants]

130.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

131.    The Defendants and Does 1-25, and/or each of them, by their actions caused Plaintiffs to be confined or knew to a substantial certainty that Plaintiffs would be confined due to their actions.

132.    As set forth in paragraphs 35-49, and 56-62, the defendants were instrumental in causing Plaintiffs to be arrested and/or made material misrepresentations and omissions in the arrest warrant that they knew would cause the judge to issue a warrant that was not supported by probable cause.

133.    California Government Code section 820 provides that a public employee is liable for injury to the same extent as a private person.

134.    California Government Code section 820.4 specifically provides that a public employee is liable for false arrest or false imprisonment.

135.    California Government Code section 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his/her employment.  Defendants **COUNTY OF STANISLAUS** and **CITY OF MODESTO** are liable under a theory of respondent superior.

136.    As a direct and proximate result of the defendants' wrongful conduct, Plaintiffs have suffered damages, including, but not limited to, legal expenses, economic losses, loss of reputation, emotional distress, and other damages.

137.    In doing the things alleged herein, the defendants' conduct was despicable. The defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

///

///

///

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
**[Plaintiffs Against Defendants Fladager, Harris, Ferreira, Bunch, Jacobson, Evers, Brown]**

138.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

139.    As described hereinabove, defendants engaged in outrageous conduct. Defendants falsely identified Plaintiff as a party to murder on nation television knowing there was no evidence to support this accusation. By such conduct, Defendants intended to cause Plaintiffs emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiffs emotional distress, or both.

140.    As set forth in paragraph 35, Defendants willfully ignored evidence of more likely suspects in the Kauffman murder, instead targeting Plaintiffs.

141.    As set forth in paragraphs 45-47, the arrest warrant lacked probable cause.

142.    As set forth in paragraphs 49, the arrest warrant contained numerous fabrications, misleading statements, and omissions of exculpatory evidence to secure Plaintiffs' arrest.

143.    As a proximate result of Defendants' conduct, Plaintiffs have suffered severe emotional distress.

144.    The outrageous conduct of Defendants was a substantial factor in the severe emotional distress suffered by Plaintiffs.

145.    Defendants' wrongful conduct has caused Plaintiffs to suffer and continue to suffer injury, including, but not limited to, economic damages, severe emotional distress, and other damages.

146.    In doing the things alleged herein, the Individual Defendants' conduct was despicable. The Individual Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard for Plaintiffs' rights, entitling them to an award of punitive damages.

///

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Georgia DeFilippo and Christina DeFilippo pray for judgment against defendants County of Stanislaus, City of Modesto, Birgit Fladager, David Harris, Marlissa Ferreira, Kirk Bunch, Steve Jacobson, Jon Evers, Cory Brown, and request entry of judgment as follows:

A.  For general damages in an amount to be determined at trial;

B.  For special damages in an amount to be determined at trial;

C.  For punitive damages against the individuals in an amount to be determined at trial;

D.  For costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. section 1988 and other relevant statutes, including a contingency fee enhancement beyond the lodestar;

E.  For prejudgment interest at the legal rate; and

F.  For such other and further relief as the court deems just and proper.

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.


DATE: October 14, 2022                    GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER


*Angelina M. Austin*
J. Gary Gwilliam
Randall E. Strauss
Robert J. Schwartz
Jayme L. Walker
Angelina M Austin
Attorneys for Plaintiffs
GEORGIA DEFILIPPO &
CHRISTINA DEFILIPPO